H. A. KOOPMAN, Appellee, v. FARMERS MUTUAL HAIL INSURANCE ASSOCIATION OF IOWA, Appellant.

No. 40058.

FEBRUARY 18, 1930.

*Hal W. Byers* and *W. C. Garberson,* for appellant.

*E. H. Koopman* and *I. R. Meltzer,* for appellee.

MORLING, C. J.—Plaintiff holds defendant's certificate of insurance to the amount of $4,200 against loss to crops from hail. On August 6, 1928, plaintiff's crops were damaged by a

 hailstorm. Plaintiff and defendant were unable to agree upon the amount of the loss. Defendant's by-laws provide that the disagreement may, by mutual consent, be settled by arbitration, as follows:

"The association shall choose one arbitrator and the assured one and the two thus chosen shall select a third and an award signed by all the arbitrators shall be final and binding upon both parties."

Defendant selected Walrod, one of its soliciting agents, as an arbitrator. Plaintiff selected Fry, his father-in-law. These two, on the nomination of defendant's arbitrator, selected Bothof as the third arbitrator. Bothof was a stranger to both the other arbitrators, but held a hail insurance certificate in defendant company, and sustained damage from the same storm that did the damage here sued for. The evidence shows that the examination into the plaintiff's loss made by the arbitrators was brief and quite superficial. Plaintiff testifies that one of defendant's agents "came to see me shortly after the papers were signed. He told me my loss was around $800. Later, he told me that was what he would allow me. Later on, Mr. Walrod [defendant's arbitrator] came to see me alone. Told me that he would pay me $800."

Walrod testifies:

"I did not offer Mr. Koopman $800. I could not offer him anything until I had looked over his crop. * * * I might have asked him if he would take $800, but I did not offer it, * * * and would not have given it to him until I looked over his fields."

One of defendant's adjusters, Senneff, who endeavored to adjust plaintiff's loss, testifies:

"I remember of making an offer to Mr. Koopman. My last offer was made as a compromise settlement, which he did not accept. * * * I believe Mr. Koopman's loss was a little greater, on the average, than the arbitrators allowed him. * * * I believe on my compromise offer I offered Mr. Koopman somewhere around 25 per cent. Twenty-five per cent would amount to approximately $750. * * * Q. Now, you offered Mr. Koopman around $800? A. In dollars and cents, I don't recall. There was $30 per acre on Mr. Koopman's 95 acres of corn. That would make a total coverage of $2,850. So if I offered him over $750, I offered him over 25 per cent. I didn't offer him $740, because I didn't offer him a lump sum of dollars at any time."

The arbitrators allowed 15 per cent, $428, which plaintiff refused to accept. Defendant's witnesses place the loss at from 10 to 25 per cent, and the plaintiff's, from 40 to 80 per cent, the loss varying, of course, in the different parts of the fields. On the evidence, it must be found that plaintiff's loss was 40 to 60 per cent. Plaintiff's arbitrator, Fry, testifies that he is 71 years old, "born across the water," was notified of his appointment by defendant's arbitrator, "had never been on an appraisement of this kind before."

"We stayed in the first piece only about five minutes, at the highest; and then, when I got in the back piece, I just kept on pulling open the ears, and I couldn't find a decent ear, which we called an ear; and we didn't stick there very long,—we went to the third piece. That stood up straight, pretty straight yet; but I couldn't find—I don't believe I found only one or two ears that wasn't hit by hail at all. * * * They said the first piece, it counted around 10 per cent; and I told them which I called the north piece, there was a total loss the time I seen it the first time, but it may a looked a little better that day that I was there. * * * We did not discuss it [percentage] any further, because I mentioned it was a total loss, that time. * * * They thought the first piece they were a little low, and that I was too high, and so they averaged 15 per cent. * * * Q. Did you know what 15 per cent meant at that time? A. Nothing about it. * * * I had an idea it was dollars, because I heard around town they paid from 10 to 15. * * * They signed, so I did."

"The Court: Q. Mr. Fry, was anything said by you or

by Mr. Walrod [defendant's agent and arbitrator] as to who should be the third arbitrator? A. No, didn't say a word. Simply asked me if I knowed that man. * * * The man was a total stranger to me. Q. Did Mr. Walrod say anything to you, or did he not in fact ask you to approve or disapprove of this third arbitrator? A. Not a word said. That was our man, and that was the way we accepted—I accepted. Because I didn't know the man,—he was a stranger to me. * * * Q. Did you or did you not have anything to do with selecting Mr. Bothof? A. No, as I told you before. Q. Now, Mr. Fry, when Mr. Walrod first called on you, and told you that you were to act as one of the arbitrators, did he tell you at that time that you had nothing to do with picking the third man? A. Yes. * * * He did not say that I had no right, but he said I was appointed by Koopman, and so he had the other man's name on the piece of paper which I told before, and he asked me where that man was, and I don't know."

The testimony shows that Fry had been farming for 36 or 37 years in the county, owned his own farm, borrowed money, paid interest, had "had lots of business dealings," had been road superintendent for years.

The evidence shows that Bothof's loss was about the same as plaintiff's, although Bothof testifies:

"I had reached an agreement with the company when I arbitrated the Koopman loss. My loss was 50 per cent. They allowed me 50 per cent. * * * Mr. Koopman was not damaged anyways near as much as mine. I had the worse damage in the neighborhood. * * * Mr. Walrod and I talked very little about my own loss. I asked him if I could get paid for my loss by the first of October, but I did not get it then. The company arranged for me to borrow it at a bank, so that I could get it earlier."

I. Defendant contends that the court should have transferred the entire cause to equity. The action was properly brought at law. Whether the issues raised by the reply were, as defendant contends, purely equitable, we do not decide. It being assumed that they were, it is provided by Section 10947, Code, 1927:

"Where the action has been properly commenced by ordinary proceedings, either party shall have the right, by motion, to have any issue heretofore exclusively cognizable in equity tried in the manner hereinafter prescribed in cases of equitable proceedings; and if all the issues were such, though none were exclusively so, the defendant shall be entitled to have them all tried as in cases of equitable proceedings."

At the most, defendant was entitled to have transferred to equity only the issues arising on its plea of arbitration. Those issues were so transferred, tried, and determined. Defendant argues that "the plaintiff failed to prove that the award of the arbitrators was grossly inadequate."  The evidence clearly shows that the award was grossly inadequate. Defendant is an assessment company. The third arbitrator, Bothof, was insured in defendant company, and it was to his interest to hold down the amount of the claims of other certificate holders. He himself was allowed for his loss more than three times the percentage allowed to plaintiff for an equivalent loss. He was favored by arrangements for earlier payment. The function of an arbitrator is quasi judicial. *Goodwin v. Merchants' & Bankers' Mut. Ins. Co.*, 118 Iowa 601, 606; *Mason v. Fire Assn.*, 23 S. D. 431 (122 N. W. 423); *Schwartzman v. London & Lancashire Fire Ins. Co.*, 318 Mo. 1089 (2 S. W. [2d Ser.] 593); *National Fire Ins. Co. v. Goggin* (Mass.), 166 N. E. 758. He should so conduct himself that the arbitration shall be free from suspicion. Idem. See *Lynch v. Kleindolph*, 204 Iowa 762; *Ames Canning Co. v. Dexter Seed Co.*, 195 Iowa 1285. Neither plaintiff nor his arbitrator knew of the interest of the third arbitrator. The award is, on this evidence, so grossly inadequate as, in connection with the other circumstances, to show such misapprehension by the arbitrators of their duties and of the facts or bad faith or fraud as to require that the award be vacated. *Turner v. Hartford Fire Ins. Co.*, 185 Iowa 1363, and cases there cited; *Schwartzman v. London & Lancashire Fire Ins. Co.*, 318 Mo. 1089 (2 S. W. [2d Ser.] 593); *Huested v. Patrons Mut. Fire Ins. Co.*, 223 Mich. 213 (193 N. W. 815); *Marshall v. American Alliance Ins. Co.*, 127 Kan. 564 (274 Pac. 243); 5 Corpus Juris 182, 186, 188; 26 Corpus Juris 425 *et seq.*

II. Fry's testimony was introduced with substantially no objection. At its close, defendant moved that all of the testimony of the witness Fry be stricken, for the reason, among others, "that an arbitrator's testimony as to his  own acts during arbitration which is directed to impeach the arbitration or his own acts is absolutely incompetent." Argument with respect to this testimony made here is of this same general character. Not all of Fry's testimony was incompetent. If portions of it were thought by defendant to be subject to the objections made, the attention of the court should be directed to that portion. The court must not be expected to perform duties of counsel to discover what, if any, portion of a witness's testimony is inadmissible. If all of Fry's testimony were excluded, the result would be the same.—*Affirmed.*

STEVENS, DE GRAFF, ALBERT, and WAGNER, JJ., concur.