FIRST NATIONAL BANK IN CEDAR FALLS, Appellant, v.
JOSEPH B. CLAY, Appellee.

No. 45765.

FEBRUARY 10, 1942.

Newman & Newman and McCoy & Beecher, for appellant.

Swisher, Swisher & Cohrt and Pike, Sias & Butler, for appellee.

BLISS, C. J.—The allegations of the petition are epitomized in appellant's propositions relied upon for reversal, to wit: (1) After submission to the arbitrators, defendant held conferences with arbitrator Stover, without the presence of plaintiff's representatives, or the other arbitrators; (2) Stover was not a fair and qualified arbitrator, in that he had been in the employ of the Clay Equipment Corporation as auditor, accountant and adviser, and sustained such confidential relations to Clay and his family, and such an intimate insight into the business of the corporation, as to make him biased and impartial; (3) defendant and Stover were guilty of fraud, collusion and misconduct prior to and during the deliberations of the arbitrators, as to invalidate the award; and (4) the award was predicated on the false assumption that during the last 20 years of the corporation's existence there were outstanding 1,301 shares of common stock, when in fact there were outstanding 600 shares during the first 8 years, 1,200 shares during the next 5 years, and 1,301 shares during the remaining 7 years.

Defendant in his answer denied all allegations on which these propositions were based, except that, as to proposition (2), he alleged that the plaintiff well knew for many years prior to the arbitration, and at the time it accepted the award, the relationship of which it complains, between Stover and the corporation and Clay, and by its failure to object on that account to Stover as an arbitrator, it estopped itself and waived any right to thereafter raise the objection.

The general factual background and a reference to matters preceding the arbitration will aid in a better understanding of the matter before us.

The corporation was organized in 1899 and was in continuous operation thereafter. The defendant, from its organization, has been the head man of the concern, in his various official capacities. Early in the year 1927, the outstanding capital stock of 600 shares was doubled by a stock dividend or by capitalizing the corporate surplus. This, obviously, did not increase the capital assets. In 1938, shares to the number of 101 were issued, which made the total outstanding common

stock at the time of the arbitration, 1,301 shares. Preferred stock to the approximate amount of $87,500 was also then outstanding. At that time, the defendant owned 335 shares of the common stock, his wife the same amount, and holdings of other members of the Clay family brought its total stock to about 65 per cent of the capital stock of the corporation.

The plaintiff was organized as a national bank in July 1939, as the successor of other banking organizations. Its president during the period involved herein was V. W. Johnson. J. B. Newman was its vice president and legal adviser. He had also been the legal adviser of the Clay Equipment Corporation for ten or more years prior to September 16, 1939. The 60 shares of stock of the Clay Equipment Corporation had originally been acquired by a predecessor of plaintiff in the foreclosure of collateral. The plaintiff paid $50 a share for the stock on its organization in July 1939, and carried it at that figure on its books.

The charter of the Clay Equipment Corporation was to expire by its terms on October 22, 1939. Newman, as its attorney, had been engaged in the preparation of its renewal papers about September 1, 1939. Notices for a meeting of the stockholders on September 16, 1939, to vote upon the renewal, were sent out on September 6th. The directors of the bank met on September 12, 1939, and decided to cast the vote of their stock against the renewal. Newman, that day, telephoned the defendant of the action of the board. Defendant, as he testified, literally begged the officers of the bank not to vote against the renewal. On September 14, 1939, Johnson, for the plaintiff, wrote a letter to defendant stating that the board of directors had instructed the bank officers to vote against the renewal, and that they relied upon receiving the real value of the stock under Code section 8365, and that it was "the expectation of our Board that the amount will be fixed at not less than $108.00 per share." This was the defendant's first knowledge of the provisions of that Code section. He feared that if other stockholders, not in the Clay group, followed the lead of the bank and voted against renewing the charter, it might lead to the liquidation of the corporation, and to great financial loss to

him. He consulted with E. L. Stover at this time about his difficulty and that he would be compelled to pay the bank a premium for its stock, to avoid greater loss. On September 15, 1939, he offered the plaintiff $80 a share for the stock, and Newman put the offer in writing and he and Johnson signed it with defendant, and recommended its acceptance to the plaintiff's board. The board rejected the offer. He then offered $80 a share with a proviso that he would sell it back to them at $70 a share. This offer was refused. He offered to arbitrate and the plaintiff refused, and insisted upon $108 a share. The defendant complained bitterly of the methods being used by the bank to force him to pay what he thought was an exorbitant price.

At the stockholders' meeting on September 16, 1939, Newman, for the first time, informed defendant that the bank would arbitrate. At that meeting, the vote to renew the charter carried, and then, relieved of the pressure which had been put upon him, the defendant made a written tender to the plaintiff to take its stock at $60 a share. The offer was refused.

During the negotiations prior to the stockholders' meeting, the defendant had told E. L. Stover that he might have to arbitrate and asked him if he would act as an arbitrator if it should become necessary. Stover had been a certified public accountant in Waterloo for 20 years. He had audited the books of the Clay Equipment Corporation since 1924 or 1925, and made out its reports in tax, and other governmental, matters.

On September 27, 1939, Newman prepared the agreement for arbitration, which, after reciting the ownership of the 60 shares of stock and the inability to agree on its purchase price, stated:

"Now, THEREFORE, it is hereby agreed by and between the parties hereto that the purchase price of said stock shall be determined by a Board consisting of E. L. Stover and Charles N. Hostetler, and a third person to be selected by them, who shall proceed at once to determine the real value of said stock.

"It is further agreed * * * that a decision of a majority of said board as to the real value of said stock shall be final, conclusive and binding upon the respective parties hereto. And

first party hereby agrees to sell and second party agrees to purchase said stock at the price so fixed, forthwith. * * *''

It was signed by the parties and defendant telephoned Stover and told him of the agreement, and that he left the matter in his hands.

Hostetler, the arbitrator selected by the plaintiff, was also a certified public accountant, who had done auditing for the plaintiff. He had known Stover for several years. He knew Johnson and Newman for several years. He had acted as an arbitrator previous to this time. Johnson and Newman discussed his being an arbitrator in this case in the director's room of the plaintiff on September 26, 1939. Of this meeting, Johnson testified:

"Before the arbitration agreement was signed Mr. Newman, Mr. Hostetler and I had a conference. The purpose of the conference was to find out if Mr. Hostetler would act as the arbitrator that we were to select. * * * We told him what we wanted done if he served as an arbitrator for our bank. Perhaps we discussed with him our ideas as to the value of this stock. I know we talked to him about the value of the stock. * * * We discussed what had happened in the ways of offers and counter-offers. * * * We told Mr. Hostetler that our Board considered Mr. Clay's offer of $80.00 inadequate. * * * I think we told him that Clay offered to sell it back to the bank at $70.00 a share. * * * We did not tell him *specifically* what we wanted him to take into account in determining the value of the stock. I don't recall that we discussed with him any further with reference to how the value of the stock ought to be determined. * * * I told him that whether it was $25.00 or $150.00 we wanted it. We wanted to emphasize the fact that there were no strings on him as to the valuation as far as that is concerned.'' (Italics supplied.)

Stover, as part of his own office records, had copies of his private audits of the Clay Company. Hostetler asked to take them for study. Stover telephoned Clay about the request, and Clay told him to let Hostetler take them and to get any other records of the corporation he wished.

Stover and Hostetler discussed by telephone who should be selected as the third arbitrator. Hostetler suggested five or six names, among them J. E. Armstrong. Stover suggested other names, and telephoned the list of six or eight names to Clay, and asked him if he had any objections to anyone on the list. Clay replied that any of them was satisfactory to him. Hostetler then induced Armstrong to be the third arbiter. The record shows him to be a respected citizen of Waterloo, a manufacturer, who had acted at other times as an appraiser, and who had also been a receiver. He was especially qualified for the place.

There is no testimony of any communications between Clay and Stover respecting this controversy, other than we have noted, excepting certain testimony by Mr. Newman to which we will refer later.

The arbitration board met in Stover's office at 1:30 p. m. on October 2, 1939, and were in consultation until about 5 o'clock that afternoon. They approached and discussed the matter from many angles. Stover had reports, records, and audits of the corporation showing sales, expenses, taxes, income, dividends, surpluses, and the affairs of the company fully and in detail from its organization to December 31, 1938. He had records showing the issuance of all common stock and preferred stock and the amounts thereof, including redemptions of preferred stock, from December 31, 1918, on down. Both Hostetler and Armstrong testified that Stover got them everything they called for. The information was all before them. There is no contradiction worthy of mention in their testimony. Their views conflicted on some matters but they all agreed upon the award. We call particular attention to the testimony of Mr. Armstrong, a wholly disinterested witness. In saying this, we are not to be understood as imputing any partiality or unfair interest to either Mr. Hostetler or Mr. Stover. We dwell somewhat upon the testimony of Mr. Armstrong because of his particular disinterest. All of them agree that the question of variance in the outstanding common stock issue was discussed somewhat. Stover testified also that "they [Hostetler and Armstrong] examined the sheet, and it had the information on it." This sheet is Exhibit 8 set out in the amended abstract.

Armstrong testified that Hostetler called him and asked him to serve and after a little debate he consented, and that he had not talked to Stover or Clay at any time prior to October 2d. He testified that Hostetler's opinion on the valuation was higher than Stover's. He then testified:

"Finally I think I made the remark, 'We will have to get down to a basis of figures so we come somewhere close to arriving at a fair value' and suggested we would take a ten year period. Mr. Stover had the audit, he was sitting on one side of the desk, Mr. Hostetler on the other, and I was, went back of the desk, between them, and the question was asked, Mr. Stover would read figures, out of the audit, Mr. Hostetler would tabulate them, and I recall we figured the value for ten years. And it seemed to me that value figured up, of the shares that was outstanding, to, I think that was 1301 shares, that the stock was worth in the twenty's, twenty dollars a share. We figured that wasn't enough, so they went further than that, and figured on twenty years, debating various angles, and I remember we debated the new Social Security Tax of corporations, and obsolescence, and things, prospects, even debated the fact the corporation being renewed, different things, and finally arrived at what we thought was a fair value, and after we had reached a decision, they hadn't thought about goodwill. I think I brought up or spoke of goodwill, and we added something for that, after we had arrived at a figure. Mr. Stover had the audit and he gave us all the information that we asked for. The records for that ten year period were unfavorable as there hadn't been any dividends of any consequence in the ten year period. That made a value that was so low that we thought it wouldn't be a fair proposition. We finally agreed to consider it upon a twenty year period. We discussed the various and diverse things that I have mentioned or others over a considerable period of time. The session lasted approximately from 1:30 until 5:00. Mr. Stover had an audit of the Clay Company. He also had some working papers there. Mr. Hostetler asked Stover questions and I would ask him questions and he would thumb through the audit and would give us some information that we needed. There were some other files there but I don't

think we went much into the figures. He made out some work papers which he might have showed us, I don't recall that. The papers were available to all of the arbitrators. He didn't hesitate to give us what we asked for. I got all of the information that I wanted with reference to the corporation, its earnings, values, and one thing and another. I didn't ask for anything that I didn't get. Mr. Hostetler didn't ask for anything that I know of that he didn't get. After we had discussed it for two or three hours we finally agreed upon the amount of the award.''

He testified that he gave no particular attention to the matter of fluctuation in the number of shares outstanding during the twenty-year period, and the fact that the number of shares outstanding fifteen or twenty years before was 600 would make no difference in the value of the stock in 1939, that the value of the stock had to be figured on the shares outstanding in 1939, and upon many other considerations, and not on the number outstanding in previous years. He was asked:

''Q. Was the value that the arbitrators fixed on October 2d, in your judgment the real value of that stock?'' His answer was ''It was.'' Mr. Stover's testimony and conclusions were in harmony with those of Mr. Armstrong.

The arbitrators made and signed the following report:

'' * * * After consideration of the book value as shown by the December 31, 1938, balance sheet after deduction of preferred dividends and income tax, prior records of net income, sales, conditions, etc. we respectfully submit the following data in support of our findings:

''OVER A 20 YEAR PERIOD

Dividends were actually paid on a basis of a .............. $45.00 value
Dividends earned on a basis of a ................................. 68.00 value

|  |  |
|---|---|
| TOTAL ...................................................... | $113.00 |
| Average value per share................................. | 56.50 |
| Goodwill per share........................................... | 1.25 |

REAL VALUE DETERMINED:      $57.75

''The above computation has been computed on a basis

which would net the investor a six percent return on his money, plus consideration of goodwill.''

The award was accepted and carried out by the parties.

Mr. Newman, who participated in the trial of this cause throughout, testified that he and Clay attended a Rotary Club luncheon on November 8, 1939, at which time the arbitration award was discussed. Newman testified that he told Clay that the arbitration board looked like ''Stover, Stover and Stover'' to him, and that Clay replied that he was the ''cookie'' who fixed up the deal, and that he had Stover in his office for two nights before the arbitration hearing, and told Stover to conceal from the other arbitrators the changes in the outstanding common stock. Clay denies any such statements on his part, and testified in substance that he ''kidded'' Newman because the bank had not accepted his offer of $80, and that Newman was in no mood to joke about the matter. Stover denied that anything of the kind ever took place between him and Clay. We have referred to the fact that Exhibit 8 showing the amounts and times of all stock issues was on the table before the arbitrators at the hearing.

Johnson, Newman and Hostetler then had a number of conferences and the latter arranged a meeting with Stover and Armstrong because, as he said, the bank was ''raising hell'' about the award. The arbitrators met on December 9, 1939, and wrote a letter to the bank and Clay that they had only considered the stock outstanding on December 31, 1938, and not the previous fluctuations, and that ''our committee will be very glad to review the matter at the request of both parties, giving consideration to the fluctuation of common stock outstanding each year over the years reviewed.'' The defendant refused the offer. Armstrong testified respecting the letter:

''I told the arbitrators on December 9 that what they were telling me about the fluctuation in the amount of stock outstanding didn't make any difference with me and wouldn't change my opinion. That was before I signed Exhibit 'F' [the letter].''

We cannot further discuss the extended examination of

the witnesses, but we have carefully considered the entire record, and it is our judgment that the appellant has failed to sustain any of the four propositions which it relies upon for reversal, with evidence of the probative force required to justify the relief prayed for. Respecting proposition (2), the record clearly sustains the answer of the defendant that the bank and its officers and Mr. Newman were fully informed as to the business relations of Stover and Clay Equipment Corporation and the defendant for many years. While Mr. Newman was attorney for the corporation, Stover consulted him at different times respecting its affairs. His audits of the corporation, over his signature, were oftentimes in the collateral files of the plaintiff.

Sections 12695 to 12711 of the Code of 1939 correspond to similar sections in all of the preceding Codes, providing for the submission and settlement of civil controversies by statutory arbitration. Such legislation has never been considered exclusive, or a bar to common-law arbitration, by which the parties might organize tribunals of their own selection to determine controversies under such rules of procedure as they might adopt. Prior to the adoption of the Code of 1897, any arbitration not according to the statutory provisions was called common-law arbitration. See Foust v. Hastings, 66 Iowa 522, 525, 24 N. W. 22; Conger v. Dean, 3 Iowa 463, 466, 66 Am. Dec. 93; Vincent v. German Insurance Co., 120 Iowa 272, 280, 94 N. W. 458; Sadler v. Olmstead, 79 Iowa 121, 125, 44 N. W. 292; Fink v. Fink, 8 Iowa 313; Burroughs v. David, 7 Iowa 154, 159; Higgins v. Kinneady, 20 Iowa 474; Thornton v. McCormick, 75 Iowa 285, 288, 39 N. W. 502; Zook v. Spray, 38 Iowa 273, 275; McKinnis v. Freeman, 38 Iowa 364, 367; 3 Am. Jur. (Arbitration and Award) 829, section 1; Older v. Quinn, 89 Iowa 445, 449, 56 N. W. 660.

Section 4395 of the Code of 1897 was incorporated therein at the time of the adoption of that Code. This section, which is section 12712 of the 1939 Code, in effect, provides for what had been designated common-law arbitration, by statute. It provides:

"Arbitration by agreement. Awards by arbitrators who

may have been chosen without complying with the provisions of this chapter shall nevertheless be valid and binding upon the parties thereto, as other contracts, and may be impeached only for fraud or mistake, but such award can only be enforced by an action."

Even after the enactment of this section, arbitrations thereunder have been referred to as common-law arbitration. Fort Dodge Lumber Co. v. Rogosch, 175 Iowa 475, 481, 157 N. W. 189; Hunter v. Colfax Consolidated Coal Co., 175 Iowa 245, 316, 154 N. W. 1037, 157 N. W. 145, L. R. A. 1917D, 15, Ann. Cas. 1917E, 803; Farmer v. Ames-Farmer Canning Co., 190 Iowa 1259, 1266, 179 N. W. 105; Myer v. Gray, 188 Iowa 373, 377, 176 N. W. 258; Ames Canning Co. v. Dexter Seed Co., 195 Iowa 1285, 1287, 190 N. W. 167.

The settlement of civil disputes by arbitration is a legally favored contractual proceeding whose object is to speedily determine the matter by a tribunal chosen by themselves, and thereby avoid the formalities, delay and expense of litigation in court. 6 C. J. S. 152; 3 Am. Jur. 830. Such a method of settling controversies is a favorite of the law. We said in Seibert Bros. v. Germania Insurance Co., 132 Iowa 58, 61, 106 N. W. 507, 508:

"It is undoubtedly true that every reasonable presumption will be indulged in favor of the legality of the award, and that the party assailing it has the burden of proof to show to the contrary."

In Vincent v. German Insurance Co., supra, 120 Iowa 272, 277, 94 N. W. 458, 460, the court said:

"Mistake of judgment on the part of the arbitrators is not ground for setting aside an award, unless such mistake be so great as to indicate partisan bias. * * * If this were not the rule, arbitration would be a useless ceremony, for we rarely find parties content with the award. In order to justify a court in setting aside an award, the misconduct or other ground of impeachment must be made out by clear and satisfactory evidence. * * * Every reasonable presumption will be indulged in favor of the award."

And, on page 279, the court said:

"Arbitrations are favored in law, and an award, when made, will be upheld, unless the evidence clearly shows such misconduct or mistake on the part of the arbitrators as to justify a court in setting it aside."

In Thornton v. McCormick, supra, 75 Iowa 285, 288, 39 N. W. 502, 503, we said:

"The award in question was not made in accordance with the provisions of the statute relating to arbitration, and is not, therefore, governed by them, but its legality and effect must be determined by the rules relating to awards at common law. * * * We understand the rule to be that an award of this kind will not be set aside for error in the judgment of the arbitrators, nor for a mistake which would not have had any material influence on the arbitrators in reaching their conclusions. To justify the interference of a court, there must be a showing of fraud, corruption, partiality, or misconduct on the part of the arbitrators, or some fraud on the part of the party relying upon the award, or a material mistake which entered into it."

In Sadler v. Olmstead, supra, 79 Iowa 121, 125, 44 N. W. 292, 293, we said:

"And such a submission is always construed most liberally, and with a view to compelling parties to submit to the adjustment of their differences made by an arbitrator fairly chosen."

In Thompson v. Blanchard, 2 (Clarke) Iowa 44, 49, the court said:

"The whole burden of proof, in this respect, is on the party who attacks the award. It is for him to clearly satisfy the jury, of any mistake, as also that he was prejudiced thereby."

To the same effect, see Tomlinson v. Tomlinson, 3 Iowa 575, 577; Sullivan v. Frink & Co., 3 Iowa 66, 73; Foust v. Hastings, supra, 66 Iowa 522, 526; Tomlinson v. Hammond, 8 Iowa 40, 45; McKinnis v. Freeman, supra, 38 Iowa 364, 367; Turner v. Hartford Fire Ins. Co., 185 Iowa 1363, 172 N. W. 166; Gorham v. Millard, 50 Iowa 554, 560; Tank v. Rohweder,

98 Iowa 154, 155, 67 N. W. 106. In Ames Canning Co. v. Dexter Seed Co., supra, 195 Iowa 1285, 1293, 190 N. W. 167, 171, one of the arbitrators had accepted the invitation of the secretary of the appellee, on behalf of himself and wife, to become his guest overnight at his home, after he had qualified as arbitrator, and before the award had been released. While criticizing the arbitrator for not avoiding the appearance of evil, the court refused to set aside the award. The court said:

"Section 4395 of the Code [1939 Code section 12712] provides that an award made under that section 'may be impeached only for fraud or mistake.' * * * We held, in Tomlinson v. Tomlinson, 3 Iowa 575, that a party complaining of an award must make out the mistake clearly and fully, and also show that, but for such mistake, the result would have been different. This rule was reaffirmed in Gorham v. Millard, 50 Iowa 554; Tank v. Rohweder, 98 Iowa 154; McKinnis v. Freeman, 38 Iowa 364; Thompson v. Blanchard, 2 Iowa 44; Tomlinson v. Tomlinson, supra; Vincent v. German Ins. Co., 120 Iowa 272; Turner v. Hartford Fire Ins. Co., 185 Iowa 1363."

In support of its first proposition, appellant states its position to be that when there is a communication between a party and an arbitrator in the absence of the other parties, the award should be set aside, even though no wrong was intended. We have found no sound authority supporting such rule. It is in clear conflict with the pronouncements of this court from its organization. Such a rule condemns what the appellant did when its president, vice-president and counsel met its arbitrator in conference in its directors' room to notify him of his selection. We are not criticizing them for this conference, but it would hardly justify the setting aside of an award favorable to the plaintiff had it received one.

As said by Morse in his work "On the Law of Arbitration and Award," page 535:

"But it is not misconduct on the part of a person to whom application is made to act as arbitrator, and who afterwards consents to do so, if at the time of the request he inquires of the party preferring it as to the general nature of the contro-

versy in relation to which his services are wanted. This is only what usually and perfectly proper occurs in such cases. A person cannot be expected to accept such an office with no idea as to the character of the duties which it will involve, or as to whether it may be within the scope of his powers or knowledge to fulfil them.'' Campbell v. Western, 3 Paige 124.

All authorities agree that any person whosoever may be chosen to fill the position of arbitrator. Morse, supra, page 99; 6 C. J. S. 186, section 46; Redman's Law of Arbitrations and Awards, 4th Ed., 111. It may not be the wise thing to do, but no legal reason suggests itself to us why the two parties may not choose a third person to act with them as a board of arbitration. Choosing arbitrators wholly disinterested is an admirable standard to aspire to, but the parties seldom do that, and if all awards were set aside in which it was not done, few awards would stand. Arbitration has always been considered as an inexpensive method of speedily and finally settling a matter upon which the parties have not agreed. It has these advantages, but like any other method of trial the result may not satisfy either party. We have already set out what this court has said must be shown to annul such an award. It is a sound rule and we have no inclination to change it or depart from it. As Justice Grier of the United States Supreme Court said, almost a hundred years ago, in Burchell v. Marsh, 17 How. 344, 349, 15 L. Ed. 96, 99, a contrary rule ''would make an award the commencement, not the end, of litigation.'' See Levin v. Northwestern Nat. Ins. Co., 8 Cir., Iowa, 185 F. 981, 983 (Reed, J., N. Dist. of Iowa), and Barnard v. Lancashire Ins. Co., 8 Cir., Neb., 101 F. 36. In the Levin case, the court said:

''The complainant arbitrator also resides in Sioux City, and is an acquaintance of the complainant. It was hardly to be expected that defendant would select a neighbor of the complainant; and the fact that it selected one from a neighboring city, who had previously acted upon several occasions in a like or similar capacity for other insurance companies, or for the defendant and also for the assured in other cases, does not

disqualify him. On the contrary, it speaks for his competency to act in such capacity.''

We have read the decisions cited by appellant including Pool v. Hennessy, 39 Iowa 192, 18 Am. Rep. 44; Brown v. Harper, 54 Iowa 546, 6 N. W. 747; Goodwin v. Merchants' & Bankers' Mut. Ins. Co., 118 Iowa 601, 607, 92 N. W. 894; Koopman v. Farmers' Mut. Hail Ins. Assn., 209 Iowa 958, 229 N. W. 221; Kraft v. Tennigkeit, 204 Iowa 15, 214 N. W. 562, and Lynch v. Kleindolph, 204 Iowa 762, 216 N. W. 2, 55 A. L. R. 745, and we have no quarrel with the results reached, but they do not control in the case before us.

We find that the propositions relied upon have not been sustained. Failure, if any there was, to give greater consideration to changes in the number of shares of stock outstanding in prior years is of no aid to appellant. Testimony of Stover and Armstrong was that this factor carried no weight with them and would not change their opinion. Hostetler, as a witness, presented some figures computed with reference to the three particular periods in which the stock outstanding were respectively 600, 1,200, and 1,301 shares, and divided the result by three. By this method, he arrived at a share valuation of $95.33, plus $1.25 for goodwill. His formula appears unsound to us. After all, each share is worth the figure found by dividing the net value of the corporate property by the total shares outstanding at the time of the arbitration. The shares then outstanding were 1,301.

The burden was upon the appellant not alone to show a mistake, but to also establish that if the mistake had not been made the result would have been different. It has failed in this.

The judgment of the distinguished and lately lamented trial judge confirms our view of the case. The judgment and decree is affirmed.—Affirmed.

STIGER, SAGER, OLIVER, WENNERSTRUM, GARFIELD, HALE, and MILLER, JJ., concur.