159 A.2d 278 (1960)
William D. FELDER, Jr., Plaintiff,
v.
ANDERSON, CLAYTON & CO., a corporation of the State of Delaware, Defendant.
Court of Chancery of Delaware, New Castle.
February 2, 1960.
Supplemental Opinion March 4, 1960.
On Question of Interest March 24, 1960.
*280 Aaron Finger of Richards, Layton & Finger, Wilmington and Maurice E. Purnell of Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., for plaintiff.
William Prickett, Sr., of Prickett & Prickett, Wilmington and Chester M. Fulton of Fulbright, Crooker, Freeman, Bates & Jaworski of Houston, Tex., for defendant.
SEITZ, Chancellor.
This is the decision on stockholders' exceptions to the appraiser's report fixing the value of shares of stock held by stockholders dissenting from a merger. The surviving corporation filed no exceptions. The two stockholders entitled to an appraisal were shareholders of Southland Cotton Oil Company ("Southland") which was merged into Anderson, Clayton & Company ("Anderson-Clayton") on July 31, 1955. These stockholders held 636 and a fraction out of a total of 12,368 outstanding shares. The delay in bringing the matter to final decision appears to have been the responsibility of the parties.
Southland was organized in 1914 by a merger of several independent companies. In 1946 Mrs. Tucker's Foods, Inc., acquired 87% of Southland's stock. In February 1952, Mrs. Tucker's was merged into Anderson-Clayton so that Anderson-Clayton thereafter owned 87% of Southland's stock. At no pertinent time did Southland have any shares outstanding other than common shares.
Southland's principal business was the processing of cottonseed in cottonseed oil mills, which removed the cotton fibers or linters from the unprocessed cottonseed, extracted the oil from the seed and prepared the residue for sale in the form of hulls, cottonseed cake and meal. The fibers or linters were sold for packing in furniture, mattresses, etc. The oil which was extracted from the cottonseed was the principal product of Southland and was sold to refiners, who, in turn, prepared the cottonseed oil for margarine, cooking oil, salad dressing and other edible products. The cake and meal were principally used for animal feeds.
On July 31, 1955, Southland owned and operated nine cottonseed oil mills located in Jackson, Mississippi; Shreveport, Louisiana; Tallulah, Louisiana; Oklahoma City, Oklahoma; Paris, Texas; Corsicana, Texas; Waxahachie, Texas; Temple, Texas and Cameron, Texas. At Jackson, Mississippi, Southland also owned and operated a solvent process plant for the removal of oil from soy beans.
As adjuncts to its Mississippi and Louisiana plants, Southland also owned and operated at Ruleville, Mississippi and Holly Bluff, Mississippi, receiving stations for the purchase and storage of cottonseed. As a source of supply of cottonseed, Southland owned and operated fifteen cotton gins in Texas and Louisiana, where it received cotton brought in from the farms, removed the seed for delivery to its oil mills and delivered the baled cotton, after ginning, to the farmer.
In addition, Southland owned and operated a feed mill in Dallas where cottonseed cake and meal were processed and mixed with other feeds and sold.
On July 31, 1955, Anderson-Clayton was the largest cotton merchant in the world, with varied activities in this country and abroad. Among its numerous activities, it *281 owned and operated cottonseed oil mills in Abilene, Lubbock, Memphis and El Paso, Texas and in Arizona, California, Mexico and other foreign countries.
The principal Anderson-Clayton oil mills in Texas were located in the western part of that State in an area known as the High Plains. In the High Plains cotton was raised on relatively large artificially irrigated farms in a dry climate. The Texas oil mills of Southland, on the other hand, were located in that part of East Central Texas known as the Blacklands. The average cotton farm in the Blacklands was considerably smaller than the cotton farms on the High Plains, and dependent upon natural sources for water rather than artificial irrigation.
The appraiser's mathematical approach to the appraised value is as follows:

Earnings Value $365.23 × 6 = $2,191.38
Dividend Value $220.00 × 4 = 880.00
 _________
 10)$3,071.38
 _________
 Per share valued 307.14

The stockholders claim that the minimum per share value should have been $827. The simplest approach is to take up seriatum the so-called six errors of the appraiser alleged by the stockholders.
The stockholders claim the appraiser committed error by accepting sale price rather than sound value in arriving at the "asset value" of Southland's plans. The appraiser did not give weight to asset value but made a finding thereon solely to assist the court. The principal area of dispute concerns the value of the plants. The appraiser found that Southland's plants were worth $1,595,000, being their sale price. His conclusion was based upon the testimony and exhibits prepared by Mr. Charles Campbell, a witness for defendant. Mr. Campbell submitted an appraisal of Southland's plants, presumably as of the date of merger. This appraisal listed the "reproductive costs", the "sound value" and the "sale price" of each of Southland's plants. The reproduction costs came to $9,570,527, the sound value to $4,471,665 and the sale price to $1,595,000. As the appraiser states in his report, Mr. Campbell testified that "sound value" was reproduction costs less depreciation and "sales price" was the value of the property in the event of a sale as a going concern. As the appraiser notes, Mr. Campbell also testified at one point, that the real intrinsic value of the properties would be their sales price.
In his appraisal report Mr. Campbell states:
"The sound values [for Southland's plants] are established in relation to the general state of repairs, obsolescence or applicability in a modern, efficient plant and represent the values of those properties to a going concern.
"The sale values are determined by my knowledge of sales of similar properties in the past and contemplating the owner only being interested in selling in its entirety or $1,595,000."
The court has some difficulty understanding Mr. Campbell's testimony as to the significance of sound value as contrasted with sales value. The appraiser's report cites certain pages of the transcript to show Mr. Campbell's understanding of the difference between the sound value and the sales value as used in the Campbell report. The appraiser himself had difficulty in understanding the difference between the two expressions. Thus, at a point later in the testimony than that cited, the following questions were asked by the appraiser and answered by Mr. Campbell (p. 2080-81):
"Q. But my difficulty is that as I understand your testimony and as I understand your report, for Jackson, for example, you would say that a sound value of $740,000 represents going-concern value, and you also say that a sales price of $300,000 represents going-concern value, and I can't understand what I think is the basic inconsistency.

*282 "A. The sound value of the equipment in Jackson is in the hands of the present owners and operators. Now, whether they like it or not, I can't decide that. If they were to offer it for sale, there are few buyers, if any, for properties of this sort, and they are brought down from the sound value to the sale prices that I have there, in my opinion.
"Q. Well, then, am I correct in understanding that to Southland the Jackson property might have been worth $740,000, if they operated it, continued to operate it, but if they sold it they could only get $300,000?
"A. To try to find a buyer, yes, sir."
It seems to me that Mr. Campbell stated that the sound values as found in his report indicated the going concern value of assets to Southland, whereas, the sale price indicated the value of the plants if they were sold to someone else for use in a going concern. As I understand the Delaware law, the asset value is to be determined by finding the going concern value of the assets to the company whose shares are being appraised. I therefore, while understanding the appraiser's difficulty, am compelled to conclude that the asset value for appraisal purposes is not the $1,595,000 found by the appraiser.
The question arises then as to whether the "sound value" found by Mr. Campbell should be considered substantial evidence of asset value, even though it is said to be depreciated reproduction cost.
It has been recognized in prior opinions of this court, see for example, Adams v. R. C. Williams & Co., Inc., Del. 1960, 158 A.2d 797, that depreciated reproduction cost is not the end-all in arriving at asset value. The appraiser was correct therefore in saying that the Delaware cases do not require that "net asset value" be determined on the basis of depreciated reproduction cost. However, the appraiser then stated that the plants would be worth the depreciated reproduction cost values appearing in the record only if the earnings of Southland were at such a level that a reasonable capitalization thereof would make the purchase of the properties on a depreciated reproduction cost basis attractive to a potential buyer. He stated further that the plants of Southland could have value to its stockholders only to the extent that they generated earnings or could be sold. He concluded that the prospective earnings of Southland when capitalized on a reasonable basis were not sufficient to support an evaluation as high as any of the depreciated reproduction costs evaluations found in the record. As a result he concluded that the maximum value for the plant as assets was no more than the sales price thereof.
As I analyze the appraiser's reasoning, he used capitalized earnings to show that the asset value could not be equal to the depreciated reproduction cost figures found in the record. This being so, he determined that the maximum asset value had to be their sales price.
The appraiser's approach seems unacceptable to me because it uses an element of value (capitalized earnings) to determine the maximum value for another element (asset value). It seems clear that the fair value of assets at a given date are not necessarily fully reflected in capitalized earnings as of that date. I say this without passing upon the correctness of the appraiser's finding that the capital expenditures were necessary to keep Southland going. One might turn it around and say that the capitalized earnings formula is unacceptable because it does not "jibe" with the fair asset value. Could we say there was no asset value where the capitalized earnings figure was zero? Compare Adams v. R. C. Williams & Co., Inc., Del.Ch., *283 158 A.2d 797.[1] The appraiser could have given effect to his conclusion that the reproduction cost depreciated was in excess of fair asset value by adjusting the weight to be given asset value in relation to earnings value in arriving at the appraised value.
It seems to me that, while Mr. Campbell stated that his so-called sound value was depreciated reproduction cost, he was coming sufficiently close to so-called actual value to warrant the use of his "sound value". I say this because "his" depreciation was based upon actual examination and evaluation of the assets involved, and because he himself was seeking to find their going concern value when he approached that aspect of the problem. It may be that actual value is somewhat less than Mr. Campbell's so-called sound value but I believe that negative factor can be taken care of by reducing the weight which would otherwise be given asset value in arriving at appraised value.
As I understand it, if the appraiser had taken Mr. Campbell's sound value figures for the plants rather than his sale price he would have arrived at a total asset value of $8,754,861, or $700.05 per share. I therefore adopt this figure as representing the asset value.
Having found an asset value (for the convenience of the court) the appraiser proceeded to eliminate it. One reason for so doing was because it was based on the sale value of the plants. Since this would be viewing the matter as though Southland was no longer a going concern, the appraiser felt he could not use such an approach under the Delaware cases. I need not consider the soundness of this reasoning because I have replaced "sales value" with "sound value" in arriving at asset value.
One other aspect of this matter must be considered. The appraiser said he did not give independent weight to depreciated reproduction cost. Apparently the appraiser's approach was to treat depreciated reproduction costs as a value factor independent of asset value, and then reject it. I think depreciated reproduction cost should be used, if at all, only as evidence of asset value. It is in this sense that I have discussed it herein.
If, as may be fairly concluded, I have used depreciated reproduction cost as the equivalent of net asset value (with a "discount"), it is pertinent to note the appraiser's statement:
"* * * that if the obsolete and obsolescent Southland mills were destroyed they would not be rebuilt as they were and probably not where they were."
The appraiser went on to say:
"Since I cannot assume that Southland would have reproduced their properties if they had been destroyed, I do not give reproduction cost less depreciation (or insurance valuations) independent weight in my determination of the value of a share of Southland stock."
The appraiser cited the following language from 1 Bonbright, Valuation of Property, pp. 159-60 as applicable to the foregoing conclusion:
"When the property is clearly not worth replacing, the appraiser should utterly ignore its replacement cost and attempt more directly to estimate value by capitalizing anticipated income, or else by accepting the current market prices of substantially similar properties  prices which, in turn, are based indirectly on a capitalization of income. But when the wisdom of the replacment is in doubt, the appraiser *284 must make two tentative valuations, the first being based on depreciated replacement cost and the second probably being based on capitalized anticipated income. The lower of these two figures will give him the best available estimate of the value of the property. Thus, if a hotel property could be replaced (without serious delay), for a million dollars but if its probable earning power would make it an intelligent `buy' only at $500,000.00, the appraiser would probably conclude that $500,000.00 measures its value and would outlaw the replacement-cost estimate."
I do not believe the Bonbright approach is of binding effect under our appraisal statute, assuming that the appraiser's premise is correct. We are talking about the going concern value of assets. If there is no better evidence of these values, depreciated reproduction cost (adjusted downward by weighting) is useful, particularly where the depreciation is based upon the actual condition of the plant structures. It must be remembered that capitalized earnings are given independent and significant weight in arriving at the appraised value of the shares. As heretofore noted, asset value is not necessarily zero because capitalized earnings amount to zero.
I conclude that "sound value" as shown in the Campbell report, was permissible evidence in arriving at asset value, there being no better evidence of such value. I further conclude that asset value as thus determined should have been given independent weight in arriving at appraised value in this case. In determining the ultimate weight given asset value the appraiser can "discount" depreciated reproduction cost evidence and thus offset one of the dangers to its use, cited by Bonbright, i. e., the assumption that fair asset value and depreciated reproduction cost are the same.
I turn now to the stockholders' contention that the appraiser committed error in finding earnings value by the selection of a five year base period for capitalization purposes. The stockholders' grievance seems to be that this period included the year of 1955 when there was a very large loss. The stockholders claim that the 1955 loss arose from a very unusual situation (drought) which was further distorted by the fact that Southland was prevented because of Anderson-Clayton's control from going outside of its normal market to obtain cottonseed to offset its unavailability in its own area.
The facts surrounding Southland's 1955 earnings are spelled out in the record at great length. I will not repeat them here except to say that I accept the appraiser's conclusion that Southland would not have been able to change its 1955 operating loss into a profit. The stockholders suggest that 1955 should be eliminated in getting an average earnings for capitalization purposes. I think the situation which brought about the 1955 loss is not so unusual that it should be eliminated. Compare Adams v. R. C. Williams & Co., above. The stockholders urge that if it is not eliminated, the number of years averaged should be increased from five to ten to minimize its impact. It is true that Southland's only loss in the ten years before the merger was in 1955. While reasonable men might differ in the first instance as to what period should be employed to obtain average earnings here, I believe the appraiser's determination to use the five year period is within the range of reason and will not be disturbed. This resulted in an average per share prospective earnings of $43.38. Any unfairness arising from the use of the 1955 earnings can be offset in arriving at the ultimate weight given this factor.
The stockholders next contend that the appraiser committed error in employing a multiplier of 8.4. They contend that this company in relation to the overall experience of similar companies justified the use of a multiplier of 12.2. The appraiser heard expert testimony and documentary *285 proof concerning the correct multiplier to be employed. He started with the 12.2 multiplier which he obtained by averaging the earnings-price ratios of representative stocks for the five year period before the merger. It resulted in a multiplier of 9.3. The stockholders say he should have used the average for the year of the merger (12.2) instead of a five year average. The appraiser said he took the five year average because the market was in a boom phase in 1955. He felt that Chicago Corp. v. Munds, 20 Del.Ch. 142, 172 A. 452, impliedly required the use of the average for a period of five years rather than one year.
I am satisfied that it was entirely reasonable for the appraiser to employ a five year average in arriving at his multiplier. The choice of a multiplier is difficult indeed, but it is more so when reliance is placed upon the stock market averages of similar companies. See 1 Dewing, Financial Policy of Corporations, (5th ed.), pp. 379, 386. I cannot find as a matter of law that the appraiser was required to limit himself in the manner contended for by the stockholders.
After finding the average multiplier, the appraiser then discounted it 10% for certain reasons, such as the lack of marketability of the stock, etc. I have reviewed the pertinent evidence and arguments and I am satisfied that his ultimate choice of 8.4 (based upon a fair comparison and discount) is within the range of reason. It will not be disturbed. This results in a per share earnings value of $365.23 per share.
The stockholders next contend that the appraiser committed error in giving independent weight to dividends. They point out that dividends are but a partial reflection of earnings (already weighted). Anderson-Clayton urged that the appraiser rely solely on earnings value. The stockholders also note that Southland was dominated by Anderson-Clayton and they allege that it declared dividends to suit its needs.
The appraiser gave independent weight to dividends because of his conclusion that Southland was not a growth company and thus dividends were of greater importance to its stockholders than in the ordinary case. He proceeded to arrive at a per share dividend value of $220 and weight it at 40%.
No prior case in Delaware has discussed "dividends" as an independent element of value to be weighted in arriving at appraised value. It was mentioned in Tri-Continental Corp. v. Battye, 31 Del.Ch. 523, 74 A.2d 71 and treated in conjunction with earnings. It was given independent weight in Heller v. Munsingwear, Inc., 33 Del.Ch. 593, 98 A.2d 774. However, there was no discussion of its importance apart from earnings. I agree with Anderson-Clayton that dividends are so closely related to earnings that they largely reflect the same value factor.
The stockholders say that the dividend record used by the appraiser reflects almost entirely a period when Anderson-Clayton determined Southland's dividend policy. They say the dividends declared reflect Anderson-Clayton's lack of concern for dividends. I believe Anderson-Clayton's emphasis on earnings value was justified in the sense that there was no need to give dividend value independent weight. This approach avoids any question as to whether Anderson-Clayton used its "control" to influence dividend policy. Moreover, the evidence on dividend value was very scanty and such expert evidence as there was thereon was rejected by the appraiser. I conclude that dividend value should be eliminated.
There being no market value, it is clear that unless asset value is given independent weight, the appraised value will consist of the capitalized earnings value. I do not believe this constructed value is entitled to exclusive consideration under our statute in the absence of the most unusual circumstances. Compare Tri-Continental Corp. v. Battye, above.
I believe the giving of a weight of 80% to capitalized earnings and a weight of 20% *286 to asset value would be fair. This conclusion properly emphasizes earnings, yet permits adjustments to reflect certain plus and minus factors herein discussed.
My result is as follows:

Earnings Value $365.23 × 8 = $2,920.84
Net Asset Value $700.05 × 2 = $1,400.10
 _________
 10)$4,320.94
 _________
 Per Share Value $ 432.09

Present order on notice.

Supplemental Opinion
This is the decision on the right of the stockholders to be awarded interest on the appraised value of their shares.
Under 8 Del.C. § 262(h) the matter of allowing interest is left to the court's discretion. Since the corporation has had the use of the dissenting stockholders' "money" from the date of the merger, I think interest should generally be allowed as a matter of course. The corporation says that interest should not be allowed here because the delay in payment is largely attributable to the stockholders' excessive estimate of the fair value of their stock which they persisted in demanding, citing Carr v. Carr O'Brien Co., 389 Pa. 195, 132 A.2d 188.
Under the terms of the merger, if the stockholders had gone along with the merger, they would have received stock having a then market value somewhat in excess of the appraised value finally determined here. However, the attempt to settle the matter on a cash basis resulted in a maximum offer by the corporation of $395 per share and a minimum offer by the stockholders of around $1,000 per share. The appraised value was $432.09 per share.
There can be no doubt that the stockholders had, in my opinion, an exaggerated view of the value of their stock. This is not unusual. I might add that the stockholders were not attempting to force a settlement by "abuse" of the appraisal process. Moreover, the corporation has not pointed to anything in the record which would indicate that the matter would have been settled without an appraisal had the stockholders' value claim been substantially less. It must not be overlooked that a dissenting stockholder has an absolute right to an appraisal, and here the appraised value exceeded the corporation's highest cash offer. It is tacitly conceded by the corporation that the undue lapse of time in conducting the appraisal proceedings cannot be ascribed to any "legal fault" on the part of the stockholders.
I conclude that the facts called to my attention do not require that the court exercise its discretion in favor of denying interest.
The corporation suggests that, in any event, the interest should only be allowed on the difference between the company's $395 offer and the appraised value. The company had the unrestricted use of the stockholders' "money" during the period of the appraisal. Compare Sporborg v. City Specialty Stores, Del.Ch., 123 A.2d 121. Under the facts I do not think the court is justified in concluding that the interest should only be allowed upon the difference between the company's offer and the appraised value. It may be that the statute should be amended to permit the corporation to pay immediately the minimum amount which the parties agree is involved. But that is not a matter for the court.
I therefore conclude that interest should be allowed from the effective date of the merger to the date of payment. I understand that counsel for the company will advise the court promptly as to whether he desires a hearing on the rate of interest to be allowed.
I am not certain that my conclusion is necessarily inconsistent with the decision in Carr v. Carr O'Brien Co., above. If it is, I can only express an understandable preference for the approach herein adopted.

On Question of Interest
The shares of the two plaintiffs were appraised. The appraised value of *287 the shares of both came to about $275,000. There is now a dispute as to the rate of interest which should be allowed under the statute.
The only Delaware case which discusses interest is Sporborg v. City Specialty, Del. Ch., 123 A.2d 121. In that case the court determined that the rate of interest to be fixed was a matter within the court's discretion. For want of any evidence the court suggested that the going money rate used in Speed v. Transamerica Corporation, D. C., 135 F.Supp. 176, 199-201, should be employed as the proper interest rate. The parties accepted it without a further hearing.
The stockholders here claim that in view of the history of the allowance of 6% interest in the Delaware courts generally this court should start with the presumption that the 6% rate is to be allowed. Plaintiffs would impose on the party contending for a lesser figure the burden of showing a good reason therefor. They claim that defendant has advanced no good reason for a lesser rate. They say, on the contrary, that the rate of interest allowed in various fields plus the loss of the opportunity to invest in comparable stock during a period of a stock boom, more than justify the allowance of 6% interest.
Defendant's approach is that the rate should be what the corporation could get as a return on the amount involved, safely invested. It contends that the rate should be no higher than 2.76%. The corporation first bases its contention upon the average rate of return during the pertinent period on funds invested in short term U. S. government securities. It is also based upon an average of the prevailing market yield on 9 to 12 month government issues for practically the entire pertinent period.
I conclude that the stockholders' approach (presumption of 6%) cannot be adopted. I say this because the statute leaves the matter to the court's discretion and because the interest really represents damages for the delay in payment and compensation for the use of plaintiffs' money. Compare Speed v. Transamerica Corporation, above; Superior Tube Co. v. Delaware Aircraft Industries, Inc., D.C., 60 F. Supp. 573. Under such circumstances one cannot start with an arbitrary presumption. In other words, the court, in the exercise of its discretionary power, seeks to find a rate which will fairly compensate plaintiffs for the fact that they were deprived of the use of their money for over 4½ years. In Speed v. Transamerica Corporation, D.C., 135 F.Supp. 176, 199-201, the court in reaching its decision considered the going money rate and also referred to cases which refer to the interest rate on bank borrowings by the ordinary borrower.
The evidence I deem pertinent is limited but I believe "rough justice" will prevail if I strike an average from the chart showing bank rates on short term loans to business for the last several years and adjust it on the basis that we are dealing with a somewhat longer term and with an individual borrower. I conclude that an interest figure of 4¾% is justified as an average for the pertinent period. The rate of return on a prudent investment for the pertinent period is not sufficiently explicit to be meaningful.
The defendant's use of the average rate for short term and 9-12 month "governments" does not strike me as being appropriate. I say this because I do not believe the sum needed to reimburse a dissenting stockholder for the loss of the use of the money can be found by deciding what the corporation could obtain by investing that amount in the government securities mentioned. In other words, the corporation's return on such an investment does not have any necessary relationship to the damage resulting from the delay in payment. See Superior Tube Co. v. Delaware Aircraft Industries, Inc., above.
The corporation cites Gulf, C. & F. Ry. Co. v. Moser, 275 U.S. 133, 48 S.Ct. 49, 72 L.Ed. 200, but I think that case is not helpful. Defendant also cites City of Danville *288 v. Chesapeake & O. Ry. Co., D.C., 34 F. Supp. 620. That case involved an action by certain plaintiffs under the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., seeking reparation for excessive freight charges. Plaintiffs sought interest thereon at 6% but the court determined that the matter was a discretionary one and pointed out that at that time money was available at substantially less than 6% even to the ordinary borrower at a bank and that investments promising reasonable safety did not yield 6%. I think this case is helpful in that it shows some of the factors which are relevant to the fixing of the rate of interest. I have considered them here. However, it must be kept in mind that the opinion was written in 1940.
While there is some suggestion by defendant that the rate should be reduced because of the lapse of time occasioned by the death of plaintiffs' expert I do not consider it a significant factor here.
In the exercise of discretion I conclude that interest should be calculated at the rate of 4¾%.
Present order on notice.
NOTES
[1] I express no opinion here as to whether a "substitute" form of earnings value can be found in such a case. Compare 1 Dewing, Financial Policy of Corp. (5th ed.) p. 305.