F. W. WOODWARD et al., trustees of Fred W. Woodward Trust No. 1 and Trust No. 2, appellants, v. MARGARET M. QUIGLEY, appellee and cross-appellant.

No. 51390.

(Reported in 133 N.W.2d 38 and 136 N.W.2d 280)

1078

FEBRUARY 9, 1965.
SUPPLEMENTAL OPINION ON REHEARING (on one point)
JUNE 30, 1965.

Clewell, Cooney & Fuerste, of Dubuque, for appellants.

O'Connor, Thomas, McDermott & Wright, of Dubuque, for appellee.

STUART, J.—The corporate life of the Telegraph-Herald, a newspaper in Dubuque, Iowa, was due to expire December 31, 1961. At a special stockholders' meeting on June 9, 1960, a resolution was duly adopted by a majority of all the stockholders extending the corporate existence perpetually. Of the 1200 shares of stock outstanding all voted in favor of the renewal except the 379 shares owned by defendant. Section 491.25 of the Code provides in part:

"In all cases of renewal, those stockholders voting for such renewal must purchase at its real value the stock voted against such renewal, and shall have three years from the date such action for renewal was taken in which to purchase and pay for the stock voting against such renewal, which purchase price shall bear interest at the rate of five percent per annum from the date of such renewal action until paid."

Plaintiffs recognize their obligation to purchase the stock under this statute, but the parties have been unable to agree on the "real value" of defendant's stock. This action was brought by the majority stockholders to secure a court determination of its "real value". The trial court established a value of $1750 per share and both parties have appealed.

In Robbins v. Beatty, 246 Iowa 80, 91, 67 N.W.2d 12, 18, we define "real value" as the "intrinsic value, determined from a consideration of every relevant factor bearing on the question of value", including "the rate of dividends paid, the security afforded that dividends will be regularly paid, possibility that dividends will be increased or diminished, the size of the accumulated surplus applicable to payment of dividends, record of the corporation, its prospects for the future, selling price of stocks of like character, value of its assets, book values, market conditions, and reputation of the corporation. It is unwise to attempt to state every factor that may bear on value of stock in a particular case."

■ I. The three standards that have received almost universal recognition in appraising the intrinsic value of stock under statutes of this type are (1) market value of the stock (2) net asset value of the corporation, and (3) investment value. 13 Fletcher Cyclopedia Corporations 335, section 5899 et seq.

"All relevant factors" referred to in the Robbins case can be considered under one or more of these three standards.

■ Market value of the stock, if it is possible to establish a value through sales on the open market, is a factor to be considered, but is not too dependable as a guide to intrinsic worth. The market price is subject to fluctuation for many reasons other than the intrinsic worth of the stock or the condition of the corporation. In this particular case, there is no evidence of any sales of stock upon the open market and admittedly no market value for stock in the Telegraph-Herald was established. This standard will not be considered here.

■ II. While most courts consider "net asset value" in attempting to arrive at the real value of the stock, there are wide differences in the way it is defined and computed. Fletcher defines the term as "the share which the stock represents in the value of the net assets of the corporation. It is a value based on a hypothetical dissolution and distribution of the corporate assets, and is one of the factors to be considered in an appraisal proceeding." 13 Fletcher Cyclopedia Corporations 339, section 5899.2. See also 55 Michigan Law Review 689, 692. The Delaware Supreme Court flatly states it has rejected the dissolution method of arriving at net value of corporate assets and requires them to be valued as a "going concern". Felder v. Anderson, Clayton & Co., 39 Del. Ch. 76, 159 A.2d 278. However, it does not appear from the facts of the cases that they have actually followed this practice. In the Felder case the Delaware Court rejected the capitalized earnings method of valuing the assets for reasons which we consider sound, saying:

"The appraiser's approach seems unacceptable to me because it uses an element of value (capitalized earnings) to determine the maximum value for another element (asset value). It seems clear that the fair value of assets at a given date are not necessarily fully reflected in capitalized earnings as of that date. * * * One might turn it around and say that the capitalized earnings formula is unacceptable because it does not 'jibe' with the fair asset value. Could we say there was no asset value where the capitalized earnings figure was zero?" Felder v. Anderson, Clayton & Co., supra, page 83 of 39 Del. Ch., page 282 of 159 A.2d.

The court then accepted the valuation of a witness who arrived at "sound value" by computing the replacement cost and depreciating it. The court said "sound value" was sufficiently close to "actual value" to warrant its use. Depreciated replacement cost does not place the value of the assets on a "going concern" basis.

The Delaware court in Sporberg v. City Specialty Stores, Inc., 35 Del. Ch. 560, 123 A.2d 121, 126, accepted a valuation of real estate which was based upon the capitalization of the estimated net rental income at six percent. This is not a valuation as part of a going concern (ladies' apparel and accessories) but a valuation of the property as rental property.

We are unable to perceive how a going concern valuation can avoid being influenced by the earnings. Capitalization of earnings which Delaware rejected seems to be the most widely recognized method of valuing assets of a going concern. Net asset value should not be influenced by earnings. We therefore prefer the Fletcher method of determining net asset value by valuing the assets as such. This offers protection to the minority stockholder in a corporation with a poor earnings record. In such instance the value as a going concern might be less than the dissolution value of the assets. It would not be fair to limit the minority interest to a value influenced by poor earnings, when the minority might prefer to liquidate and convert the assets into cash, and at the same time place the majority in a position where it could later liquidate and receive the entire benefit of the greater liquidation value. Net asset value will, in most instances, be of far less importance than the investment value of the stock, because the real value of the stock is still to be determined as in a going concern. However, net asset value as defined by Fletcher is a factor to be considered. The weight to be given this factor will depend upon the facts in each case.

We do not find the evidence here on the net asset value very satisfactory. Plaintiffs depend upon the evidence of Mr. James P. McKean of the American Appraisal Company in which he expresses his opinion as to the "real value" of the assets of the corporation. Even though there is a detailed appraisal of the physical assets, his testimony reveals that his real value was

limited to the value of the earnings capitalized at six percent. He testified:

"My real value appraisal of the net assets of the Telegraph-Herald as of June 9, 1960, in the amount of $1,649,307, if divided by $99,000, my estimated future income, would yield a rate of return on tangible assets of about six percent. Money costs are very close to six percent. Therefore the Telegraph-Herald barely earns an adequate return on their tangible assets."

It was brought out on cross-examination that Mr. McKean's evaluation of the Telegraph-Herald building and lots was only $50,000 more than the valuation his assistant placed upon the lots as if they were vacant. Other vacant lots were valued by McKean at considerably less than the value placed upon them by his assistant. He justified the reduction by stating:

"In my opinion the real value of the assets of the Telegraph-Herald as of June 9, 1960, was $1,649,307. The earnings of the Telegraph-Herald do not support a higher valuation. Investors would not be attracted to this property at a higher purchase price because the earnings of the Telegraph-Herald would not give the desired return on their invested capital."

Further proof that his valuation was based upon earnings is found in his evaluation of radio station KDTH: "In my opinion the real value of the radio station as a going concern is in excess of the value of its separate assets. To reflect this opinion I evaluated the license and other intangibles of radio station KDTH in excess of $97,000."

As his valuation of the net corporate assets was based upon, or at least limited to, a capitalization of earnings, we reject it as did the Delaware court for the reasons quoted above from their opinion in the Felder case.

Defendant offered a detailed appraisal of the real estate and personal property by Marshall and Stevens of Chicago. The appraiser arrived at the "sound value" of the property by computing the replacement cost and deducting depreciation. A figure which was reached in this manner was approved in the Felder case, even though this method of evaluation was not approved. "Sound value" is essentially an insurance con-

cept. A large proportion of defendant's appraisers' experience was in appraising for insurance purposes. We do not believe that such an evaluation of assets is helpful for our purpose here. Our "real objective is to ascertain the actual worth of that which the dissenter loses because of his unwillingness to go along with the controlling stockholders, that is, to indemnify him." Warren v. Baltimore Transit Co., 220 Md. 478, 483, 154 A.2d 796, 799. There is no suggestion that the property could be sold for the sound value. It is common knowledge that sound value as thus computed in almost all instances exceeds the market value of the property. For this reason we do not accept sound value as a proper measure of the loss to the dissenter on the standard of net asset value. There was evidence of the market value of the lots owned by the Telegraph-Herald appraised as if they were vacant, but buildings and personal property were not valued on this basis.

▓ In this particular case we are not seriously handicapped by the absence of satisfactory evidence of net asset value. Here, as in most instances, investment value is of much greater importance. The Telegraph-Herald is worth considerably more as a going concern than the amount which would be realized upon the liquidation of its assets. The extent by which its fixed assets are deficient for its present and future operation can and will be considered in determining the investment value of defendant's stock.

▓ III. Before turning to a discussion of the investment value of defendant's stock, we must dispose of two propositions urged by plaintiffs which directly affect its real value. Plaintiffs' valuation witnesses arrived at the real value of defendant's stock by giving an opinion as to the value of the stock in the corporation per share and then discounting that value (1) for a broker's commission and (2) because defendant's share represented a minority interest. Plaintiffs argue that these are "relevant factors" to be considered in determining the real value or intrinsic worth of defendant's share in the corporation. We do not agree with this argument.

▓ Defendant's stock is to be valued as in a "going concern". Plaintiffs have repeatedly urged this proposition. We

believe their arguments on these two propositions are a departure from that principle. These factors would be present only in the event of a sale of stock and would therefore be more likely to affect market value of the stock than investment value. There is no reason to consider either of these factors here. It was necessary to consider liquidation value of the assets to protect the minority from an arbitrary action by the majority. In these instances there are no brokerage commissions to be paid in fact and the majority will not be subject to the handicaps of a minority stockholder by such a purchase.

We also believe that consideration of such factors would negative one of the main purposes of section 491.25. The original statute was similar to those enacted in most states to modify the common-law rule which required unanimous consent of all the stockholders for a substantial change in the corporate structure. The increase in the number of corporations and stockholders made such a rule impracticable. The statute was enacted to permit a majority to vote to renew the corporate life and at the same time allow a dissenting minority to get out of the corporation with the "real value" of its stock. It prevented the minority from being squeezed out for a lesser price.

The U. S. Supreme Court discussed this type of statute in Voeller v. Neilston Warehouse Co., 311 U. S. 531, 535, 61 S. Ct. 376, 377, 85 L. Ed. 322, 326, and in speaking through Justice Black said:

"At common law, unanimous shareholder consent was a prerequisite to fundamental changes in the corporation. This made it possible for an arbitrary minority to establish a nuisance value for its shares by refusal to cooperate. To meet the situation, legislatures authorized the making of changes by a majority vote. This, however, opened the door to victimization of the minority. To solve the dilemma, statutes permitting a dissenting minority to recover the appraised value of its shares were widely adopted."

In Iowa, prior to 1933, the statute as then worded and interpreted required the majority to purchase the dissenter's stock as a condition precedent to the issuance of a certificate of corporate renewal. In those instances where the majority was unable to

finance the purchase of the minority stock, the. minority was in a position to force a liquidation against the will of the majority.

In 1933 the Forty-fifth General Assembly, chapter 143, section 1, attempted to correct this injustice by adding the following sentence:

"Stockholders voting for renewal shall have three years from the date such action for renewal was taken in which to purchase the stock voted against such renewal, which purchase price shall bear interest at eight [now five] per cent per annum from the date of such renewal action until paid, * * *."

In State ex rel. Robbins v. Shellsburg Grain &' Lumber Co., 243 Iowa 734, 739, 53 N.W.2d 143, 145, we discuss this historical development saying: "It is true * * * the object of the purchase clause in the statute is to protect a minority stockholder against roughshod tactics upon the part of a majority group." We conclude that the 1933 amendment "was enacted to protect the majority group in voting for a renewal of the corporate charter. It gave to them a three-year period of grace within which to arrange for payment of the real value of the dissenters' stock, without being harassed by judgments and executions."

We do not here have a question of the issuance of a certificate of renewal or harassment by judgment or executions. We are concerned with the real value of defendant's stock and the amendment did not change the basic purposes of the statute. The majority was given the right to continue the corporation in return for the payment to the minority of its fair share of the real value of the corporation. It is contrary to the purpose of the statute to discount the minority interest because it is a minority. This in effect would let the majority force the minority out without paying it its fair share of the value of the corporation.

No cases have been cited which say outright that there should be no discount because a minority interest is involved. Our attention, however, has been directed to several cases which seem to so hold, in effect. In American General Corporation v. Camp, 171 Md. 629, 637, 190 A. 225, 228, the Maryland court stated that the dissenting stockholder was entitled to receive

"the aliquot proportion which the number of shares held would be entitled to receive in the distribution of the net amount of the corporate funds in which his particular kind of stock would be entitled to share."

In Tri-Continental Corporation v. Battye, 31 Del. Ch. 523, 526, 535, 74 A.2d 71, 72, 76, the Delaware court said:

"The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern * * *. The ultimate value of General's common stock, therefore, is the percentage of the fair asset value which could reasonably be expected, at some time, to have been realized by the common stockholder."

First National Bank v. Clay, 231 Iowa 703, 717, 2 N.W.2d 85, was an action to set aside an arbitration award fixing the real value of the stock of a minority interest on the grounds of fraud, mistake and misconduct. Although the point was not directly involved, we assumed there would be no discount for a minority interest when we said: "After all, each share is worth the figure found by dividing the net value of the corporate property by the total shares outstanding at the time of the arbitration."

Plaintiffs cite many tax cases which have considered the lack of marketability of a minority stock interest in a closely held corporation an important factor in arriving at the value of such interest for tax purposes. There is no doubt that the market value of such minority interest is less than the average value per share of the stock or that a majority interest is worth more. In considering the value for tax purposes it is proper and necessary to discount the value because it is a minority interest. The statutory protection afforded the minority interest in cases of the kind here involved distinguishes this case from the tax cases. As we have stated above, the statute is designed to protect the minority from the very considerations which result in a discounted value in the tax cases. By statute the minority is guaranteed the "real" value of its stock.

Plaintiffs cited Felder v. Anderson, Clayton & Co., 39 Del. Ch. 76, 87, 159 A.2d 278, 285, in which the court apparently approved a ten percent discount from the average multiplier

"for certain reasons, such as the lack of marketability of the stock, etc.". In view of our interpretation of the purpose of the statute, we decline to follow the Delaware court in this position, if it, by this statement, approves such a discount.

IV. Among the factors to be considered in determining the real value of defendant's stock are the shareholders' equity or net worth of the corporation as fairly reflected on the corporate books and past net earnings of the corporation as an indication of the prospective earnings. The parties disagreed as to both the correct net worth and past earnings. We must therefore determine which figures in our opinion most fairly reflect the net worth and the earning capacity of the corporation.

The disagreement between the parties on the amount of the shareholders' equity in the Telegraph-Herald on June 9, 1960, results from the difference of opinion of the accountants for the respective parties over the proper treatment of six items. Defendant accepts the balance sheet of Ernst & Ernst, plaintiffs' accountants, with the following exceptions:

(A) Goodwill, $267,872. For the purposes of this discussion, this term is used to include all intangibles about which there is a dispute. The total is made up of three separate items. The cost of patents relating to hotel registers in the amount of $4865 purchased in 1901 and no longer printed by the newspaper and circulation promotion costs in the amount of $160,845 incurred between 1901 and 1918 had been deducted as expenses from income tax returns. In 1925, with the approval of the Department of Internal Revenue, they were capitalized to decrease the World War I excess profits tax which was dependent upon the capital structure of the company. The prior returns were amended to take out the amounts previously included as expenses. The third item was excess of cost over the subsequent sales price of assets acquired from the Times-Journal in 1927 in the amount of $102,522. When purchased, the Times-Journal was operating at a loss, however the acquisition of the assets of the corporation left the Telegraph-Herald as the only daily newspaper published in Dubuque. The tangible assets were all sold and only the subscription list or circulation structure was retained. The figure of $102,522 represents the premium paid by

the Telegraph-Herald for the subscription list and the monopolistic position. These items were carried as assets on the company's books until July 18, 1960. Ernst & Ernst had recommended their elimination in the audit for the year 1959 and had furnished adjusting entries which were not made by the company until that date.

 Our interest here is to settle on a balance sheet which fairly reflects the financial condition of the newspaper. It is difficult for us to see how an expired patent for a product no longer printed, circulation promotion occurring before 1920, and a subscription list over 30 years old can enhance the financial condition of the paper. These specific items were properly removed from the books. Ernst & Ernst first audited the Telegraph-Herald to determine its eligibility for a loan and felt this item would mislead a loaning agency. It would also be deceiving to a prospective purchaser. This is not to say that the newspaper has no intangible value, as the subsequent evaluations will disclose, but this is a matter to be determined by other means than a balance sheet intended to reflect the financial condition of the company as fairly represented by its books. These goodwill items were properly excluded.

(B) Bad debts, $9993. Under income tax regulations bad debts may either be charged off directly or handled by setting up a reserve. Prior to June 9, 1960, the company used the direct charge-off method which varied in amount from $2886 in 1956 to $480 in 1958. In 1960, prior to June 9, the accountants charged off $4100 in accounts receivable and in addition set up a $10,000 reserve. Bad debts for the whole year in fact totaled only $3902. The reserve is a duplication and is excessive. As there was a reserve account in the amount of about $7, the current assets were understated by $9993.

(C) Profit sharing contribution, $8044. In October 1960 the newspaper voluntarily created a profit sharing plan which was made retroactive to the first of the year. The newspaper's accountants prorated the cost over that portion of the year preceding June 9, 1960, in striking its balance. In the first instance it seems proper to prorate the cost, but such a holding would place management in the position of being able to voluntarily

create liabilities after the date upon which valuation for the purposes of this statute are to be made and thereby reduce the net worth of the stock retroactively. This is particularly true of a liability such as this in which management will share the benefits. The current liabilities should be reduced by $8044.

(D) Charitable contribution, $4469. After June 9, 1960, the newspaper made contributions to its foundation in an amount, when prorated, reduced the June 9, 1960, balance sheet surplus by $4469. This item is similar to the profit sharing entry and results in a subsequent act reducing the net worth retroactively. There is, however, a history of charitable giving over a period of years and the amount seems to be in line with previous gifts. We hold this contribution is in the nature of an accrued expense which can properly be prorated. Defendant comments that the balance sheet prepared for the newspaper by Ernst & Ernst on August 31, 1959, did not show such accrual. However, the audit was completed in October prior to the time the contribution was actually made. This item was properly included in the Ernst & Ernst balance sheet.

(E) Accrued interest, $2482. The newspaper listed the promissory note of David L. Smith, an employee, as an asset, but did not accrue interest in the amount of $2482, claiming it had been waived by the officers. It would not be proper to allow officers of the company to waive interest and reduce the net worth of the company, nor does it appear that a waiver occurred in fact. On September 28, 1960, Smith wrote a letter to an officer of the company in which he acknowledged owing the paper $21,032 "principle" which is the face amount of the note plus accrued interest. Investment assets should be increased by $2482.

(F) Subscription liability overstated by $35,666. The Ernst & Ernst balance sheet shows a liability for subscriptions paid in advance in the total amount of $68,587.87. This represents payments by mail subscribers on unexpired subscriptions. Defendant argues the liability should be reduced by $35,666 which is the 52 percent tax rate on the amount which has already been accrued and is shown as a liability. We agree. Plaintiffs attempt to justify the figure by saying this is the amount which must be refunded to customers if the newspaper went out of

business. This is not accurate because any amount paid would be deductible as an expense and a credit would be received from the government at the current tax rate. In addition the balance sheet should be prepared as a going concern. In our judgment this is a duplication of a liability which results in the overstatement of the current liabilities by $35,666.

In summary we believe the financial condition of the Telegraph-Herald is most fairly represented by making the following adjustments to the Ernst & Ernst balance sheet dated June 9, 1960, known as plaintiffs' exhibit K.

### Assets

| | | |
|---|---:|---:|
| Current assets ........$ | 932,299 | |
| (1) Increased by reduction of Bad Debt Reserve ........ | 9,993 | |
| Adjusted total of current assets ........$ | | 942,292 |
| Investment & Other Assets ........$ | 146,391 | |
| (2) Increased by accrued interest on D. L. Smith note ........ | 2,482 | |
| Adjusted total ........ | | 148,873 |
| Property, plant and equipment ........ | | 600,458 |
| Total assets as adjusted ........$ | | 1,691,623 |

### Liabilities

| | | |
|---|---:|---:|
| Current liabilities ........$ | 265,383 | |
| Adjusted by: | | |
| (3) Elimination profit sharing plan contribution ........$ 8,044 | | |
| (4) Overstatement of subscription liability ........ 35,666 | 43,710 | |
| Adjusted current liabilities ........$ | | 221,673 |
| Stockholders equity ........$ | 1,413,765 | |
| Adjustments 1 — ........$ 9,993 | | |
| 2 — ........ 2,482 | | |
| 3 — ........ 8,044 | | |
| 4 — ........ 35,666 | 56,185 | |
| Adjusted stockholders equity ........ | | 1,469,950 |
| | | $ 1,691,623 |

V. The earnings of the Telegraph-Herald are of great importance in determining the value of defendant's stock. For that reason they should be represented as fairly and accurately as possible. The most important source of information about prospective earnings is the record of earnings over the past several years. The profit and loss statements of the corporation reflect the earnings as recorded on the books of the corporation.

Plaintiffs' Exhibit J is a statement of comparative operating income from 1950 to 1959 based upon the profit and loss statements which have been adjusted by the elimination of certain nonrecurring losses as indicated in the footnotes. Defendant's accountant concedes the accuracy of plaintiffs' figures, but claims there are other losses which should have been deducted as nonrecurring, as the corporation was constituted on June 9, 1960. These consist of operating losses on an FM radio station sold in 1958, losses on rental properties disposed of in 1959, the operating loss on radio station KDEC sold in 1952, and two items of travel expense disallowed by the Department of Internal Revenue in 1951 and 1956.

With the exception of the travel expense item, these losses were incurred in business ventures of the corporation not included in its operation on June 9, 1960. Even though it was perfectly correct to report the reduced net income resulting from these losses and even though some were repeated over a number of years, it would seem the earning prospects of the corporation would be more accurately reflected by eliminating these loss items which were no longer a burden on the corporation on the date in question. Little argument is raised concerning the travel expense items and it would seem proper to exclude expenses which were not proper corporation business expenses. We believe the net income should be adjusted by the elimination of these losses.

Defendant's Exhibit I-Q makes these adjustments to net income before taxes, provides for the additional income tax chargeable to the adjustments and arrives at an adjusted net income for an operating statement which we accept as fairly representing the earnings of the corporation for the years set forth.

Another question involved is the period of time over

which we should look at the earnings. Exhibit J and O-1 are for a ten-year period and arrive at a ten-year average. Mr. John A. Grimes an expert witness for defendant used only 1959 and the annualized income for 1960 based upon the June 9, 1960, figures. It is our conclusion, based upon the history of the company. and other relevant factors, that the average for the past five full years most fairly reflects the company's earnings. The ten-year period is too long. In a stable area and in a stable business with little growth prospects, there is no reason to limit consideration to the most recent year. There is no evidence in the record to indicate that the annualizing of the 1960 income up to June 9 would fairly reflect the profit over the whole year. The Delaware Court used a five-year average in Sporberg v. City Specialty Stores, Inc., 35 Del. Ch. 560, 123 A.2d 121. See also Felder v. Anderson, Clayton & Co. (1960), 39 Del. Ch. 76, 159 A.2d 278, Adams v. R. C. Williams & Co. (1960), 39 Del. Ch. 61, 158 A.2d 797. Mr. Grimes also included income from a subsidiary not existing in 1959 or at the time of trial. We believe prospective earnings are more accurately reflected by not considering the income of this subsidiary.

 Defendant raises the issue of the salaries paid the officers of the corporation who are also the majority stockholders. Mr. Grimes testified the compensation to officers averaged $16,100 to $18,000 more than the average of newspapers of corresponding sizes. He adjusted the income accordingly. Plaintiffs point out that federal income tax audits have approved the salary scale. The compensation of F. W. Woodward rose from $21,825 in 1950 to $34,100 in 1959 or an increase of 56 percent. The compensation of F. R. Woodward rose from $22,425 in 1950 to $34,100 in 1959 an increase of 52 percent. Mr. Mark R. Kane became an officer in 1952 and his salary rose from $9880 as of that date to $13,360 in 1959. These percentages of increases do not seem to be substantially out of line in view of the inflationary times, however, the figures of Mr. Grimes while not satisfactory in many respects indicate the salaries are at least liberal. Majority stockholders should not by the device of compensating themselves liberally as officers be in a position to reduce the net operating income of the corporation for our purposes here. We,

therefore, further adjust the net income of the corporation upward by $8000 as a reasonable adjustment for the liberal salaries received by the officers. This is not to say that the officers have committed any wrong by receiving compensation in these amounts, but we believe such increase in net profit more fairly represents the operating income of the corporation.

The chart on the following page summarizes our conclusions on these matters and sets forth the average adjusted net income for five years in the amount of $106,538, which we will use as the net earnings figure in all places where it is a factor.

VI. Both parties offered detailed testimony and opinions of value of defendant's stock by highly qualified experts. The thoroughness with which this case was presented is illustrated by the fact that the record consists of nearly 2700 pages. We must consider, compare and evaluate the testimony of these experts. As each expert relied heavily upon the figure for corporate net earnings, and as they used the differing net earnings figures supplied by their accountants, our comparison must necessarily include the application of their formulas, if any, to the net earnings determined in Division V hereof in the amount of $106,538

The direct examination of Mr. McKean, one of plaintiffs' experts, covers some 267 pages of the record. It discloses his broad experience in the appraisal field but little firsthand knowledge of newspaper valuation specifically. He made a detailed study of the Telegraph-Herald operation and of the area which its serves. He also made a thorough search to find comparable newspapers the stock of which is sold on the market. The testimony is supported by numerous charts and graphs, some, of course, are based upon information obtained from the plaintiffs' accountants Ernst & Ernst. He arrived at an opinion of a real value for one share of stock in the Telegraph-Herald of $915 which he discounted by 20 percent for a minority interest to arrive at a value of $732 per share for the stock of defendant.

Adjusted
Comparative Operating Statement
The Telegraph-Herald
for years ending December 31.

| | 5 yr. Avg. | 1959 | 1958 | 1957 | 1956 | 1955 |
|---|---|---|---|---|---|---|
| Income as shown on plaintiffs Exh. J | 195,161 | 223,741 | 170,334 | 155,325 | 213,273 | 213,130 |
| Total adjustments made on defendant Exh. 1-Q | | 4,370 | 8,757 | 9,195 | 11,792 | 15,965 |
| | | 228,111 | 179,091 | 164,520 | 225,065 | 229,095 |
| Adjustment for excessive salaries | | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 |
| Total adjusted income before taxes | 213,177 | 236,111 | 187,091 | 172,520 | 233,065 | 237,095 |
| Provision made for income tax on plaintiffs Exh. J | | 112,562 | 83,868 | 74,912 | 106,802 | 106,406 |
| Increase provision for State and Federal Income Tax (54% of total adjustment) | | 6,680 | 9,049 | 9,285 | 10,688 | 12,941 |
| Adjusted provision for income tax | 106,639 | 119,242 | 92,917 | 84,197 | 117,490 | 119,347 |
| Adjusted Net Income | 106,538 | 116,869 | 94,174 | 88,323 | 115,575 | 117,748 |

 He arrived at the valuation by averaging and weighting seven different approaches to value based on (1) "earnings" (2) "dividends" (3) "book net worth" (4) "real value". Five out of the seven approaches depend upon the three comparable companies he selected and in turn depend upon what he called the market value of their securities. The difficulty with these five approaches is that he did not establish a market value for the stock of his comparables. There were only a few isolated offers to buy at stated amounts. There were no records of any offers to sell or completed transactions. Regardless of how near the Telegraph-Herald might compare with the selected newspapers, there is no basis for comparison of value unless a market value of the comparables was established. Here there was none.

The two remaining methods of evaluation used by Mr. McKean are "estimated future earnings" and "real value". He used a price-earnings ratio of 10 to 1 to establish value. This figure was discounted 15 percent for broker's commission and increased $283 per share for the excessive reserve. He arrived at a value of $915 per share. By using our figure for net profit and disregarding the broker's commission, we make the following computation of value:

Estimated future earnings........$106,538 × 10 = $1,065,380
Per share 1200 shares ........................................... 888
Share of Reserve ................................................ 283
Value per share ...............................................$ 1,171

As stated in Division III, we do not believe discount for minority interest or broker's fees is proper.

The other method utilized book value of all assets of the corporation as shown on the Ernst & Ernst balance sheet except the fixed assets which he appraised at a "real value" of $836,000 or $235,540 higher than the book value of the fixed assets. His real value thus computed was $1,649,307 or $1374 per share. This, however, is not the appraised market value of the fixed assets but a capitalization of the earnings of $99,000 at 6 percent. If we capitalize the earnings figure of $106,538 at 6 percent we arrive at a valuation of $1,775,600 or $1480 per share. This, of course, is just another method of using the earnings to

arrive at a net asset value which method we have disapproved. See Division II above.

Mr. Henry D. Bradley, majority stockholder in the St. Joseph, Missouri, daily newspaper, testified as an expert for plaintiffs. He had worked out a formula for computing valuation that he used when he purchased his interest in his paper. This is the only newspaper he has purchased and he has never served as appraiser or broker for newspapers. He has been interested in methods of evaluation and has kept himself informed. He uses the formula in computing the value of stock to be sold to his employees. By using our figures and Mr. Bradley's formula we make the following computation of value.

| | |
|---|---:|
| Estimated income | 106,538 |
| | $\times$ 6 |
| Add: (from Ex. K) | 639,228 |
| Current assets | 942,292 |
| Other assets and Inv. | 148,873 |
| Total | 1,730,393 |
| Deduct current liabilities | 221,673 |
| Total value | 1,508,720 |

or about $1257 per share.

VII. Defendant presented three evaluation witnesses, George J. Cooper, John Alden Grimes and Vincent J. Manno. All three had impressive qualifications including broad experience in the valuation of newspaper properties for sale or appraisal purposes. Mr. Cooper is a negotiator, broker and appraiser of newspaper properties. He has sold or negotiated for newspapers all over the country. He makes it his business to keep advised of all sales of newspapers. He visited the Telegraph-Herald properties briefly and used the audits and accounting information compiled by defendant's accountants, Arthur Andersen & Company. He listed all factors he took into consideration in valuing defendant's stock and placed particular emphasis on the monopolistic position of the Telegraph-Herald as the only daily newspaper published in the Dubuque area. Cross-examination revealed that he had made only a cursory study of local conditions or the growth prospects of the Tele-

graph-Herald. He did not use any set formula but arrived at a value of $2,700,000 to $2,800,000 for the Telegraph-Herald. He valued defendant's stock at $2187.50 per share or a total of $829,062.50, which is discounted slightly because of "overreaching" prospective purchasers. He testified he could produce a buyer for the newspaper in 90 days for his valuation of $2,700,000.

Mr. Grimes had equally impressive qualifications. It takes four pages of the record to list the names of newspapers he has appraised since 1935. He testified that he had reliable information on the sales price of 85 to 90 percent of all daily newspapers sold during that time. His approach to the value of defendant's stock was based upon his opinion of the selling price of the whole property on a free and open market between willing and informed buyers and sellers. He first adjusted the net earnings to reflect what in his opinion was the proper amount for 1959 and the income to June 9, 1960, was annualized. He then multiplied the average of these earnings by 17.3 which was the average price-earnings ratio of the sale price of three newspapers he considered comparable. To this figure he added $385,000 which he called excess working capital and $137,262 for investment assets. By using his formula and our figure for earnings we arrive at the following valuation:

| | |
|---|---:|
| Earnings | 106,538 |
| P/E ratio | 17.3 |
| | 1,843,107 |
| Excess working cap. | 385,000 |
| Investment assets | 137,262 |
| Total value | 2,365,369 |
| or | $ 1,971 per share. |

Vincent J. Manno was also a negotiator, broker and appraiser of newspaper properties. His deposition was taken in New York. He had never visited Dubuque or the circulation area of the Telegraph-Herald. He did not claim to have any particular knowledge of local conditions. His information about the Telegraph-Herald was obtained through the audits and accounting material supplied by defendant's accountants and the

physical appraisal made by Marshall & Stevens of Chicago. He testified from his broad experience and knowledge of newspaper sales that the Telegraph-Herald had a real value of $2,640,000 and that he could produce a buyer at that price. The per share value of defendant's stock at that price was $2200. To test his evaluation he used three different approaches. We will substitute our figures in the appropriate places and recompute the valuations using these approaches.

(1) The consolidated profit approach:

| | | |
|---|---:|---:|
| Net profit of $106,538 | | |
| Capitalized at 8% | | $1,331,725 |
| Current assets | 942,292 | |
| Invest. assets | 148,873 | |
| | 1,091,165 | |
| Less liabilities | 221,673 | |
| Net Quick Assets | 869,492 | 869,492 |
| Total evaluation | | $2,201,217 |

Per share $1834.

(2) Individual gross approach. In this approach the net quick assets are added to the gross income. There was no dispute over the gross income so the computation would be approximately the same. This method of valuation reached a figure of over $2,900,000 or $2432 per share.

(3) Goodwill approach based on net tangible assets.

| | |
|---|---:|
| Total assets as adjusted | $1,691,623 |
| Less adjusted liabilities | 221,673 |
| Net tangible assets | $1,469,950 |
| 8% of net tangible assets as income attributable to investment | $ 117,596 |
| 5 year average earnings before taxes | $ 213,177 |
| Less income attributable to investment | 117,596 |
| Income from Goodwill | $ 95,581 |
| Capitalized at 12½% ($95,581 ÷ 12.5%) | $ 764,648 |
| Add net tangible assets | 1,469,950 |
| Total value | $2,234,598 |

Per share $1862.

Mr. Manno in arriving at his valuation weighted the first and third approach 25 percent each and the gross income approach 50 percent. He explained this by saying there was a pretty well-fixed rule of thumb that newspaper properties are worth at least the gross income plus the quick assets and that the Telegraph-Herald should be making about two times as much net on its gross. We do not agree with this weighting. It seems a fallacy to say that a newspaper in which the net income is low can be sold on the basis of its gross on the theory that it should net twice as much as it is. This puts all the blame upon management and none on local conditions or the physical plant. It does not appear in the record that Mr. Manno made the type of investigation which would support such a conclusion. We consider the first and third approaches as more reliable and realistic indicators of value than the gross income approach.

VIII. To summarize the valuations of the experts which were based upon formulas and mathematical computations using figures acceptable to us, we find the following per share valuations. It becomes evident the spread in valuation is much less when the same figures are used.

Plaintiffs' witnesses:
Mr. McKean:
 Capitalization of future earnings .................................$1171
 real value (earnings, cap. at 6%) ........................ 1480
Bradley formula .................................................. 1257
Defendant's witnesses:
Mr. Grimes ........................................................ 1971
Mr. Manno:
 (1) consolidated earnings ............................ 1834
 (2) gross income approach ............................ 2432
 (3) Goodwill ............................................ 1862

The weakness in the opinions of defendant's witnesses is in the fact that they do not give the consideration to the local conditions and particular situation of the Telegraph-Herald we feel is justified. The record is full of charts, graphs and testimony, all of which are uncontested, which show that conditions in the circulation area are static: There is a very slow growth in population. The number of retail stores has declined. The

percentage of advertising is shifting from the more profitable national advertising to local advertising. The circulation of the paper has been stable for ten years and there are no projections of growth. There is no possibility of increasing the circulation in the metropolitan area of Dubuque. The presses are obsolete and must be replaced in the not too distant future with presses capable of running full color to meet competition. This will require extensive alterations and construction, the total cost of which will exceed one million dollars. Dividends have been cut to build up a surplus so that these improvements can be made. Without further detailing of the evidence, it is sufficient to say these factors are of some importance in arriving at the real value of the Telegraph-Herald and defendant's stock therein.

IX. There is a marked similarity between the future earnings formula employed by Mr. McKean and the formula used by Mr. Grimes. Mr. McKean multiplied his estimated earnings by 10 and added defendant's share of the reserve. We disregard the discount for a minority interest and broker's commission. Mr. Grimes multiplied the earnings by 17.3, his estimate of the proper price-earnings ratio, and added the excess working capital and investment assets to reach a total value before determining the value per share. The main difference is in the multiplier to be used or the price-earnings ratio.

Mr. McKean obtained his multiplier of 10 by using the average P/E ratio of his three comparable newspapers. We have not accepted his comparables because he did not establish an actual sale price or offer price, but only a bid price. We have discussed this matter previously. Mr. Grimes obtained his multiplier by taking the average of three newspaper sales he considered comparable in Nyack, New York, San Gabriel Valley, California, and Savannah, Georgia.

We do not believe it is realistic to compare the Telegraph-Herald in Dubuque with newspaper sales in the three cities mentioned. Nyack, New York, is in rich Westchester County, just north of New York City. The San Gabriel Valley paper is quite new and has experienced a phenomenal subscription growth. These two papers were located in areas of rapid progress and growth. Savannah is in an area of moderate growth, but the

population is about three times that of Dubuque and the newspaper circulation more than double that of the Telegraph-Herald.

We believe the formula employed by Mr. Grimes is the easiest to understand and furnishes a reliable guide to value in this particular case. The other methods are useful and we are not discounting their propriety. As a further aid to our determination of the real value of defendant's stock, we have applied Mr. Grimes' formula to our figure for earnings using the multiplier of 13.5 which we believe to be a realistic one for the Telegraph-Herald, with the following result:

| | |
|---|---:|
| Earnings | $ 106,538 |
| P/E ratio | 13.5 |
| | 1,438,263 |
| Excess working cap. | 385,000 |
| Investment assets | 137,262 |
| Total value | $1,960,525 |

Per share $1634.

We have felt it necessary, because of the nature of this case, to use many figures and formulas as aids in arriving at real value of defendant's stock. We should make it clear, however, that we recognize this matter cannot be determined by any exact mathematical computation and no one formula or figure is binding or conclusive. Too many of the figures are estimates and all of the formulas contain elements based on the opinion of the expert. The decision is, in the final analysis, a matter of judgment based on all material evidence and consideration of all relevant factors which may influence the valuation. It is therefore our opinion, based on all the evidence and the consideration of all factors we deem relevant, that the real value of defendant's stock in the Telegraph-Herald is $1650 per share or a total of $625,350. The costs are taxed one half to defendant and one half to plaintiffs.

The opinion of the district court as so modified is affirmed. —Modified and affirmed.

All JUSTICES concur.

Opinion on Rehearing June 30, 1965.

Clewell, Cooney & Fuerste, of Dubuque, for appellants.

O'Connor, Thomas, Wright, Hammer & Bertsch, all of Dubuque, for appellee and cross-appellant.

STUART, J.—Plaintiffs were granted a rehearing upon the original opinion reported at 257 Iowa 1077, 133 N.W.2d 38. They complain that the computation used as an aid in arriving at the real value of defendant's stock overstated such value because the investment income was included in the earnings to which a price-earnings ratio was applied and the value of the investment assets was then added to the resulting figure. The point raised is a valid one. It is obvious the value is inflated when the value of the assets and the income therefrom are both used in the same computation. The price-earnings ratio is applied to operating income and it was improper to have included investment income.

The parties agree generally on the gross investment income, but differ as to the amount of income tax which should be deducted to arrive at net investment income. Defendant applied the regular corporate tax rates and plaintiffs applied the reduced rates applicable to the particular type of income, for example, no income tax was deducted from interest on municipal bonds. It is our conclusion that the income tax deducted on Schedule J, referred to in the initial opinion, was computed at the actual tax rates applicable. This is the testimony of Mr. McKean appearing on page 117 of the record and is supported by computing the income tax by this method. The average net investment income determined in such a manner was approximately $4700.

In resistance, defendant points out that the Visual Education subsidiary, contrary to the statement in our opinion, was in existence during the five-year period used and we did not consider either the income or net worth in our computation. While the corporation had not been dissolved, it was not doing business at the time, and the income would not have been a useful guide to future profits of the corporation. However, the net worth of the subsidiary should have been included in investment assets.

Our computation, therefore, is to be adjusted in two particulars. (1) The earnings are to be reduced from $106,538 to $101,838 by deducting $4700 investment income. (2) The investment assets are to be increased from $137,262 to $149,928 by adding the net worth of Visual Education in the amount of $12,666. The corrected computation is as follows:

| | |
|---|---:|
| Earnings | 101,838 |
| P/E ratio | 13.5 |
| | 1,374,813 |
| Excess working cap. | 385,000 |
| Inv. Assets | 149,928 |
| Total value | 1,909,741 |
| Per share $1591. | |

Plaintiffs, however, place too much reliance upon this mathematical calculation. They would urge us to set the value of defendant's stock at $1591. They misconstrue the purpose of the computation. As pointed out in the last paragraph of our opinion, the valuation of the stock in the final analysis is a matter of judgment based on all material evidence and the consideration of all relevant factors. The formula used is not an exact scientific certainty in which the answer is the only correct answer. Too many of the elements are estimates and opinions. It was used as an aid in arriving at our judged valuation and to test its reasonableness. Since the formula was an important factor in our final judgment, the errors herein discussed did affect the final figure, but not to the extent urged by plaintiffs. We feel in all fairness, however, that the corrections should be reflected in the final judgment and therefore reduce the value of defendant's stock to $1620 per share or a total of $613,980. In all other respects the opinion filed February 9, 1965, is confirmed.

Defendant's motion to retax the costs is denied.

All JUSTICES concur.