# IN THE COURT OF APPEALS OF IOWA

No. 16-0121
Filed July 19, 2017

**WALNUT CREEK TOWNHOME ASSOCIATION,**
Plaintiff-Appellant,

**vs.**

**DEPOSITORS INSURANCE COMPANY,**
Defendant-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Robert B. Hanson, Judge.

Walnut Creek appeals the district court's rejection of an appraisal report.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Timothy D. Johnson of Roeder Smith Jadin, P.L.L.C., Bloomington, Minnesota, and Anthony R. Epping of Epping Law Office, P.C., Des Moines, for appellant.

Apryl M. Delange and Jeff M. Margolin of Hopkins & Huebner, P.C., Des Moines, for appellee.

Heard by Mullins, P.J., and Bower and McDonald, JJ.

**BOWER, Judge.**

In August 2012, a hailstorm struck the Walnut Creek Townhome Association ("Walnut Creek" or "the association"), a housing community located in Urbandale. The association submitted an insurance claim to its insurer, Depositors Insurance, which denied most of the claim. Walnut Creek subsequently brought an action against Depositors for breach of contract and to seek a declaratory judgment. Before trial, the parties went before an appraisal panel. The panel found the association sustained approximately $1.4 million in damages as a result of the August 2012 hailstorm. The district court, however, concluded the association was not entitled to any relief. Walnut Creek now appeals.

I.

As of August 2012, Walnut Creek contained thirty-six multi-family buildings. Buildings in the association were constructed between 2004 and 2006. The association is governed by a board of directors.

In 2011, the board had discussions about the necessity of repairing roofs in the association. It hired a roof inspector, Marcus Harbert, to review the association's buildings. Harbert noticed issues with the shingles of the roofs he inspected. The shingles Walnut Creek primarily used were known as CertainTeed New Horizon shingles. New Horizon shingles, several experts testified, are known to have a manufacturer's defect that causes cracking and

crazing in the shingle appliqué, and significant granule loss in the shingle.[1]  At a board meeting in June 2012, a representative from Harbert's employer told the board the shingles "could possibly be faulty."  In response, the board formed a roofing committee.

On August 8, 2012, a hailstorm hit Urbandale and the surrounding area, including the association.  The hail in the neighborhood was reported to be "pea size" to "dime size."  Association members reported leaking roofs, loose shingles, and grit or grain coming off the roofs after the storm.

In August 2012, "within a week" of the storm, Harbert inspected the roofs again.  He did not observe any hail impacts significant enough to warrant an insurance claim.  Harbert recommended the association follow through with a warranty claim for the defective shingles.  Coincidentally, Harbert lived in Walnut Creek for a year, and testified another storm in September 2013 blew shingles off roofs.  Harbert also observed the roofs again in May 2015 and concluded the roofs had sustained two to three hail hits per square,[2] but that the only reason to replace the roofs was the manufacturer's defect.

In September 2012, Walnut Creek had a roofing renovator, Nick Waterman, inspect the roofs.  He concluded the roofing "definitely" had hail damage, noting "anywhere from eight to twelve hits" per square.  Waterman testified his standard practice was to ignore hail hits to the appliqué because such damage is "not accepted in the insurance-related field."  He would, in

---

[1] "Crazing" was described as cracks in the asphalt "meandering in different directions" unpredictably.  The "appliqué" is a raised portion of a shingle used to create a textured look.

[2] Squares are ten feet by ten feet.  The insurance industry standard to replace a roof is six to eight hits per square.

certain circumstances, double the size of the area he sampled to make up for the fact the appliqué accounted for roughly half the area of the individual shingle. In this case, he testified he "voided" the appliqué because he was aware of the manufacturer's defect. Waterman also testified he observed hail damage to the "soft metal, fascia, gutters, air conditioner units, [and] window screens."

Two engineers from Haag Engineering testified: Robert Danielson and Richard Herzog. Haag Engineering was retained by Depositors to inspect the association buildings in December 2012. The firm prepared a report on its findings. Danielson noted there were nine "hail events" in the Urbandale area between 2006 and September 2012. Danielson also noted one building, Building 19, did not have the New Horizon shingle. The Haag Engineering report states the appliqué shingles were "generally in poor condition" but the "three-tab shingles [on Building 19] were generally in good to fair condition with respect to weathering." Danielson testified he looked for fractures, punctures, ruptures, bruises, or holes to conclude a roof was damaged by hail. He did not see signs of that. He did observe granular loss in the shingles. Herzog testified, given the weight of the shingles, the hail in the community would have been of insufficient size to cause damage.[3] The Haag Engineering report further stated, of nineteen fractures and punctures on the vinyl siding, most were either not consistent with hail damage or not caused by the most recent hail event. Only one, the report concluded, was consistent with recent hail impact "as noted by the coincident spatter mark and on an elevation that was consistent with the most recent hailstorm event."

---

[3] There was evidence sufficiently large hail fell elsewhere in Urbandale.

In 2013, a public adjuster, Timothy Barthelemy, assessed the thirty-six Walnut Creek buildings and made conclusions similar to Waterman's. Generally, his conclusion was that hail caused damage to the properties. His team of inspectors observed nine to eleven hits per square in the area assessed. He also excluded the appliqué from his assessment. Barthelemy had conducted "probably 400" appraisals. Barthelemy testified sometimes hail damage takes "a winter" to show up in a shingle. Barthelemy also testified he discussed the damage with Danielson. In Barthelemy's view, fracture or not, damage existed. According to Barthelemy, the policy covers "physical damage or physical loss. So I'm looking for something that the shingle is physically damaged, and that would be cosmetic damage." Danielson agreed cosmetic damage is physical damage. The Haag Engineering report concluded "[d]ents in the gutters, downspouts, fascia and trim, window cladding, window screens, and flue caps related to hail fall were a cosmetic condition that would not functionally alter the material."

Depositors denied most of Walnut Creek's claim on February 13, 2013. Depositors agreed to pay $124,656.79 based on small dents to the "soft metal" items, including fascia, gutters, and downspouts. Depositors stated damage to windows and air conditioning units was not covered under the policy. In August 2013, Walnut Creek filed suit for breach of contract and a declaratory judgment.

The parties' insurance policy provides for appraisal. Walnut Creek requested appraisal. In July 2014, Walnut Creek moved for summary judgment and asked the district court to approve language to be used on the appraisal form. In its summary judgment ruling in October 2014, the court declined to

approve any language, but sought to "clarify what issues in this case are determinable by appraisers and which issues are properly saved for litigation." The court concluded "[t]he parties may fully litigate whether *all* of the loss to the property was a result of a covered event (here, the hail storm)—in other words, whether the *cause* of the damage is *covered* under the policy." The court also stated "[t]he appraisers and umpire must consider what damage was caused by hail, what damage was not, or damage with which they are unconcerned, such as normal wear and tear." The appraisal took place May 5, 2015, only a few weeks before trial.

Depositors' appraiser, Eric Howell, a property adjuster, also testified. Howell testified he had concerns about the appraisal umpire, Larry Roth, because Roth's experience was, in Howell's view, with fire and water losses, not hail damage. However, Howell agreed to use Roth as the umpire because, Howell testified, he believed Roth would be bringing "an independent engineer experienced in assessing hail damage" with him. No such person was present at the appraisal. Howell testified he did not sign off on the appraisal award form because he "disagreed with what was being presented as a final number." Howell testified he was reluctant to stop the appraisal because it had been rescheduled "a couple times" due to weather and trial was "right around the corner."

Waterman, Barthelemy, and Danielson were all present at the appraisal. Roth served as the umpire on the panel. Walnut Creek selected James Pierce as its appraiser and Howell served as Depositors' appraiser. Evidence was presented to the appraisal panel, including the Haag Engineering report. Five

buildings were inspected as part of the appraisal. The appraisal panel was aware of Walnut Creek's warranty option.

The appraisal award begins with a declaration of competence and disinterest signed by both appraisers. It next contains this statement:

> The Appraisers and Umpire above-referenced hereby agree and stipulate that the appraisal herein is limited in scope to the amount of loss and damage as a result of a hail and windstorm that occurred on or about August 8, 2012. The award does not include an evaluation or determination of coverage, policy exclusions or the relative causation of the same.

The award section contains four itemized awards. Each is listed with a description of the property damaged, a replacement cost, a depreciation percentage, a depreciation amount, and an actual cash value. The four items listed are "direct physical loss roofing," "matching roofing (additional)," "siding, gutters, fascia," and "air conditioners." The appraisal concludes with this: "We, the undersigned, pursuant to our appointment, certify that we have truly, conscientiously and impartially performed the duties assigned us and have appraised and determined and do hereby award the following amount of loss. Minimum of two signatures required." Pierce and Roth signed the appraisal award. The combined amount of loss is $1,467,830, representing the total replacement cost for the four property items listed.

A bench trial was held May 27 and 28, 2015. The district court concluded the appraisal was not binding or conclusive and dismissed Walnut Creek's claims. This appeal followed.

II.

Depositors challenges the timeliness of Walnut Creek's appeal. A party has thirty days to appeal a final judgment. *See* Iowa R. App. P. 6.101(1)(b). Judgment herein was entered August 19, 2015. Walnut Creek filed a post-judgment motion on September 3. The post-judgment motion requested enlargement or amendment pursuant to Iowa Rule of Civil Procedure 1.904(2) and a new trial pursuant to rule 1.1004. Such motions may toll the appeal period. *See id.* The district court denied those motions in an order issued December 21. Walnut Creek's notice of appeal followed within thirty days of that order.

Depositors asserts Walnut Creek's appeal is untimely because the 1.904(2) motion was improper. Our supreme court has repeatedly held only "proper" 1.904(2) motions toll the appeal period. *See, e.g.*, *Hedlund v. State*, 875 N.W.2d 720, 725 (Iowa 2016). Depositors asserts Walnut Creek's 1.904(2) motion was simply an improper "rehash" of previous arguments. *See Bellach v. IMT Ins. Co.*, 573 N.W.2d 903, 905 (Iowa 1998). We disagree. In its ruling on the motions, the district court issued a "clarification" on burden-shifting that amounts to an amendment or enlargement of its previous ruling. *Cf. McKee v. Isle of Capri Casinos, Inc.*, 864 N.W.2d 518, 526 (Iowa 2015) ("The district court in fact modified [one] aspect of its original ruling when it acted on McKee's motion."). Therefore, the 1.904(2) motion was a proper one and the appeal is timely.

Additionally, Walnut Creek also brought a motion for new trial. We are aware of no rule requiring a motion for new trial to conform to the same propriety requirement as a 1.904(2) motion. Where the case law refers to a "proper"

motion for new trial, the term "proper" unfailingly either (a) refers to timeliness or (b) appears in dicta with citations to 1.904(2) cases. *See, e.g.*, *Union Tr. & Sav. Bank v. Stanwood Feed & Grain, Inc.*, 158 N.W.2d 1, 3 (Iowa 1968) (equating "improper" with "untimely"); *In re J.L.*, 868 N.W.2d 462, 465 (Iowa Ct. App. 2015) (citing string of 1.904(2) cases). If we were to conclude a motion for new trial must be "proper" to toll the appeal period, we might find it need only identify some enumerated basis for new trial. *See* Iowa R. Civ. P. 1.1004(1)-(9). The district court here found two such bases in Walnut Creek's motion—1.1004(6) and 1.1004(8). Under any test we might use, the motion for new trial tolled the appeal period. The appeal is timely.

III.

The appraisal process allows parties a forum for dispute resolution without a formal lawsuit. *See Cent. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 466 N.W.2d 257, 260 (Iowa 1991). Policy provisions providing for appraisal are valid and binding on the parties. *See id.* Under the terms of the insurance policy at issue, either party could demand appraisal of the loss:

> **Appraisal.** If we and you disagree on the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser after receiving a written request from the other, and will advise the other party of the name of such appraiser within 20 days. The two appraisers will select an umpire. If appraisers cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of property and the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:
> a. Pay its chosen appraiser; and
> b. Bear the other expenses of the appraiser and umpire equally.

> If there is an appraisal, we will still retain our right to deny the claim.

"Most courts favor appraisal as a way of avoiding costly and time-consuming litigation." 12 Jeffrey E. Thomas, New Appleman on Insurance Law Library Edition § 149.07(1)(k) (2016) ("Appleman"); *see also First Nat'l Bank v. Clay*, 2 N.W.2d 85, 91 (Iowa 1942). As a result, although appraisal awards may be set aside by a court, courts will indulge in every reasonable presumption to sustain the award. *See* Appleman § 149.07(1)(k); *see also Cent. Life*, 466 N.W.2d at 260; *Seibert Bros. & Co. v. Germania Fire Ins. Co.*, 106 N.W. 507, 508 (Iowa 1906); *cf. Ales v. Anderson, Gabelmann, Lower & Whitlow, P.C.*, 728 N.W.2d 832, 839 (Iowa 2007) (noting, in arbitration context, court's function "is not to determine whether the arbitrator has correctly resolved the grievance" because such second-guessing would "nullify the very advantages of arbitration"). "The award will not be set aside unless the complaining party shows fraud, mistake or malfeasance on the part of an appraiser or umpire." *Cent. Life*, 466 N.W.2d at 260; *see also Jupiter Aluminum Corp. v. Home Ins. Co.*, 52 F. Supp. 2d 885, 888 (N.D. Ill. 1999) ("[A] party who voluntarily submits to appraisal to determine the amount due under an insurance policy is bound by the appraisal award, absent exceptional circumstances. To hold otherwise would frustrate the very purpose of the appraisal clause."); Appleman § 149.07(1)(k); *cf. United States v. Moorman*, 338 U.S. 457, 461 (1950) ("Findings of [an arbitrator], even where employed by one of the parties, were held 'conclusive, unless impeached on the ground of fraud, or such gross mistake as necessarily implied bad faith.'" (citation omitted)); *Ky. River Mills v. Jackson*, 206 F.2d 111, 117 (6th

Cir. 1953) ("But it is the proof of bias or unfairness or partiality on the part of an arbitrator that results in unjust advantage, and calls for the setting aside of the award."). The award will not be set aside simply because the court disagrees with the result. *See Cent. Life*, 466 N.W.2d at 260; *cf. Ales*, 728 N.W.2d at 839 (asserting comparable standard in arbitration context).

By the terms of the policy, "the amount of loss"—damages—is a factual issue left to the determination of the appraisers. *See Terra Indus., Inc. v. Commonwealth Ins. Co.*, 981 F. Supp. 581, 607 (N.D. Iowa 1997); *Taylor v. Farm Bureau Mut. Ins. Co.*, No. 07-1580, 2008 WL 4525496, at *4 (Iowa Ct. App. Oct. 1, 2008). Whether coverage under a policy exists—liability—is a question for the court. *See Just v. Farmers Auto Ins. Ass'n*, 877 N.W.2d 467, 471 (Iowa 2016) ("Generally, interpretation of an insurance policy is a question of law."); *Adams v. N.Y. Bowery Fire Ins. Co.*, 51 N.W. 1149, 1150 (Iowa 1892) ("Clearly the appraisers were not authorized to exercise their judgment as to what was or was not included within the policy."); *North Glenn Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 854 N.W.2d 67, 70 (Iowa Ct. App. 2014) ("Coverage questions, such as whether damage is excluded because it was not caused by wind, are legal questions for the court as this case goes forward." (citing *Quade v. Secura Ins.*, 814 N.W.2d 703, 706–07 (Minn. 2012))); *see also Taylor*, 2008 WL 4525496, at *4 (contrasting role of court in appraisal proceedings with arbitration, which "will generally decide an entire controversy").

"Causation relates to both liability and damages because it is the connection between them." *State Farm Lloyds v. Johnson*, 290 S.W.3d 886, 891–92 (Tex. 2009). "Courts across the country are divided as to whether, in

determining the 'amount of loss' pursuant to appraisal provisions like the one here, appraisers may consider questions of causation." *Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n*, 100 F. Supp. 3d 1099, 1101–02 (D. Colo. 2015); *see also North Glenn*, 854 N.W.2d at 70. In Iowa, appraisers make the initial causation determination, because "[c]ausation is an integral part of the definition of loss, without consideration of which the appraisers cannot perform their assigned function." *North Glenn*, 854 N.W.2d at 71 (citing *Loss*, Black's Law Dictionary (9th ed. 2009)); *see also Quade*, 814 N.W.2d at 708 ("[A]s an incidental step in the appraisal process . . . the appraisers must necessarily determine the cause of the loss, as well as the amount necessary to repair the loss."). The policy's "appraisal of the loss" therefore requires the appraisal panel to make causation determinations. *See CIGNA Ins. Co. v. Didimoi Prop. Holdings, N.V.*, 110 F. Supp. 2d 259, 264–65 (D. Del. 2000) ("Black's Law Dictionary defines the term 'amount of loss' as 'the diminution, destruction, or defeat of the value of, or of the charge upon, the insured subject to the assured, *by the direct consequence of the operation of the risk insured against*, according to its value in the policy, or in contribution for loss, so far as its value is covered by the insurance.' Thus, the definition provided by Black's expressly includes a causation element." (citing *Amount of loss*, Black's Law Dictionary 83 (6th ed. 1990))). However, "the causation determinations by the appraisers may be subject to further review by the district court." *North Glenn*, 854 N.W.2d at 71. This is a necessary check on fraud, mistake, or malfeasance. *See Cent. Life*, 466 N.W.2d at 260. The trial court is therefore empowered to act in something of an appellate role. *Cf. Wallace v. Des Moines Indep. Cmty. Sch. Dist. Bd.*, 754

N.W.2d 854, 858 (Iowa 2008) (explaining certiorari is available to review judicial or quasi-judicial functions); *Cent. Life*, 466 N.W.2d at 261 ("[T]he function of the appraiser becomes quasi-judicial."). "[W]hether the appraisal award will be conclusive on all issues will depend on the nature of the damage, the possible causes, the parties' dispute, and the structure of the appraisal award." *North Glenn*, 854 N.W.2d at 71 (citing *Quade*, 814 N.W.2d at 708).

The district court performed a *North Glenn* analysis and held the appraisal award was not binding upon the parties. Walnut Creek contends the district court should have held the appraisal award was binding and conclusive on the issue of causation. We review such determinations for correction of errors at law. *See Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 178 (Iowa 2010).

In conducting its *North Glenn* analysis, the district court wrote:

> In light of the *North Glenn* factors, the Court finds the Appraisal Award is neither binding nor conclusive upon the parties. First, the defective and deteriorating shingles are at the core of the Association's roof damage. This is shown by Harbert's 2011 examination of the roofs, Association's board discussions, and Association's attempt to exclude the defective portions from the damage calculations. Second, Association's roof damage resulted from multiple concurrent causes, including the significant and pre-existing manufacturer's defect and multiple severe weather events. The August 8, 2012 storm was only one of several possible causes of damage to the roofs. Third, Association was aware or should have been aware of the Policy exclusions: Depositors stated the exclusions in the contract and reserved their right to raise all defenses in multiple pieces of correspondence. Further, for almost a year prior to the storm, Association was making plans to replace the roofs via a manufacturer's warranty. Finally, the Appraisal is not signed by all parties and addresses only one of multiple causes for the roof damage. Because Association has not shown by a preponderance of the evidence that the Appraisal Award is binding and conclusive on the parties, the Court holds that the parties are not bound by the Appraisal Award and its conclusions.

We conclude the district court misapplied the *North Glenn* factors. The purpose of the *North Glenn* test is not to substitute the court's fact finding for the appraisal panel's. The purpose is to evaluate the structural and environmental underpinnings of the appraisal award and search out evidence of fraud, mistake, or malfeasance. Upon our independent consideration of the *North Glenn* factors, we see no reason to reject this appraisal award: the nature of the damage, possible causes, parties' dispute, and structure of the appraisal do not suggest fraud, mistake, or malfeasance. We therefore accept the appraisal's conclusions as to the amount of loss and causation as binding and conclusive.

IV.

Walnut Creek challenges the district court's finding Depositors did not breach the contract because the alleged loss was not covered under the policy. We begin our analysis with the burden of proof. When an insured seeks to enforce a provision of an insurance policy, "the burden of proof initially is on the insured to prove that both the property and the peril were covered by the terms of the policy." *Hometown Plumbing & Heating Co. v. Secura Ins. Co.*, No. 11-0309, 2012 WL 1245755, at *4 (Iowa Ct. App. Apr. 11, 2012); *see* 17A *Couch on Insurance* § 254:11 (2016) ("Generally speaking, the insured bears the burden of proving all elements of a prima facie case including the existence of a policy, payment of applicable premiums, compliance with policy conditions, the loss as within policy coverage, and the insurer's refusal to make payment when required to do so by the terms of the policy."). Once the insured has established a prima facie case, "[t]he burden of proving that coverage is excluded by an exclusion or exception in the policy rests upon the insurer." *West Bend Mut. Ins. Co. v. Iowa*

*Iron Works, Inc.*, 503 N.W.2d 596, 598 (Iowa 1993); *see Long v. Glidden Mut. Ins. Ass'n*, 215 N.W.2d 271, 274 (Iowa 1974) ("[A]n insurer has the burden to prove the applicability of a policy exclusion. The insured is not required to negate the exclusion in order to present a prima facie case." (citations omitted)); 17A *Couch on Insurance* § 254:12 (2016) ("Until a prima facie case of coverage is shown, the insurer has no burden to prove a policy exclusion. The insurer bears the burden of proving the applicability of policy exclusions and limitations or other types of affirmative defenses, in order to avoid an adverse judgment after the insured has sustained its burden and made its prima facie case."). In both cases, the standard of proof is preponderance of the evidence, absent any higher burden required by statute. *See Hometown Plumbing & Heating Co.*, 2012 WL 1245755, at *4.

The law regarding the interpretation and construction of insurance policies is well established and need not be repeated herein. *See Amish Connection, Inc. v. State Farm Fire & Cas. Co.*, 861 N.W.2d 230, 236 (Iowa 2015).

We turn to the language of the policy at issue. Under the heading "EXCLUSIONS," the policy states in part:

> **B. EXCLUSIONS**
> 1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.
> . . . .
> 2. We will not pay for loss or damage caused by or resulting from any of the following: . . . .
>     *l.* Other Types Of Loss
>       (1) Wear and tear;

(2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

. . . .

But if an excluded cause of loss that is listed in paragraphs (1) through (7) above results in a "specified cause of loss", "accident" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

. . . .

3. We will not pay for loss or damage caused by or resulting from any of the following B.3.a. through B.3.c. But if an excluded cause of loss that is listed in B.3.a. through B.3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

. . . .

c. Negligent Work. Faulty, inadequate, or defective:

. . . .

(3) Materials used in repair, construction, renovation or remodeling[.]

In section A(3) of the policy, "Covered Causes of Loss" are defined as follows: "This Coverage Form insures against Risks of Direct Physical Loss unless the loss is" excluded under the EXCLUSIONS heading (section B), limited under "paragraph A.4, LIMITATIONS," or limited or excluded by two headings called PROPERTY LOSS CONDITIONS (section E) and PROPERTY GENERAL CONDITIONS (section F). Elsewhere in the policy "specified cause of loss" is defined to include "windstorm or hail," among other conditions.[4]

The district court first concluded the policy excluded coverage of the roof damage because Walnut Creek "did not prove the storm was the only direct or indirect cause of physical damage to the roofs." That language and the district court's citation to the policy demonstrate the court was relying on EXCLUSIONS paragraph B(1) of the policy. This was a mistake. Sections B(1)(a) through (i)

---

[4] This fact may come as a surprise to Depositors, which omitted the "hail" exception from its brief in this hail case.

list several exclusions not relevant here; for example, "nuclear hazard" and "war and military action." Only B(2) is relevant; no section of B(1) is implicated by the damage at issue. It was incorrect for the district court to rely on the language of B(1).

The district court next concluded the shingles contained a product defect that triggered deterioration, coverage of which would be excluded under paragraph B(2)(*l*)(2) of the policy. We find this is inconsistent with the binding conclusions of the appraisal panel and must be rejected. The appraisal panel's binding fact findings support the conclusion hail caused this damage.

Finally, the district court concluded the defective construction bars recovery under the policy's "Negligent Work" exclusion. This provision is irrelevant given the binding appraisal findings. The panel concluded the damage did not result from defective construction of the type contemplated by the policy provision.

V.

Finally, Walnut Creek requests additional funds to pay its "soft metals" replacement costs. The "soft metals" are the siding, gutters, and fascia. Depositors did grant a portion of Walnut Creek's claim for the amount of $124,656.79, based on this damage. Subsequently, the appraisal panel calculated $159,541.51 (in replacement cost) or $119,656.51 (actual cash value) for damages to these portions of the buildings and awarded the replacement cost. Walnut Creek requests the difference between the $124,656.79 it has received and the $159,541.51 it believes it is owed. It is incorrect in that belief. The policy provides: "We will not pay on a replacement cost basis for any loss or

damage . . . until the lost or damaged property is actually repaired or replaced." There is no evidence in the record the "soft metals" have been repaired or replaced; indeed, at oral argument, Walnut Creek argued it has not made repairs because it believes Depositors should pay it first. This claim fails.

VI.

The district court erred in rejecting the appraisal award. Because of that error, the district court erred in its application of the policy. The facts of this case and the applicable law compel a different result. We reverse the judgment of the district court as to the appraisal award and breach of contract claim. We remand with directions to enter judgment in favor of Walnut Creek consistent with the appraisal panel's award, excluding the amount predicated on damage to the air conditioning units, which are not covered under the policy. Without a showing it has completed repairs to the "soft metals," Walnut Creek is not entitled to additional payment on a replacement cost basis for the "soft metals" items. We affirm the judgment of the district court on the "soft metals" issue.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Mullins, P.J., concurs; McDonald, J., dissents.

**MCDONALD, Judge (dissenting).**

As the majority notes, "[c]ourts across the country are divided as to whether, in determining the 'amount of loss' pursuant to appraisal provisions like the one here, appraisers may consider questions of causation." *Auto-Owners Ins. Co.*, 100 F. Supp. 3d at 1101–02. In *North Glenn*, 854 N.W.2d at 70, this court held appraisers could determine causation because determining causation is integral to determining the amount of loss. I respectfully disagree with *North Glenn* and dissent from the majority's conclusions that the determination of causation is a proper subject of appraisal and that the appraisal award was binding under the circumstances. I also respectfully dissent from the majority's conclusion the district court erred in concluding any loss was an excluded cause of loss. I would affirm the judgment of the district court.

I.

A.

I first address whether the determination of causation is an appropriate function of an appraisal panel, generally. *North Glenn* and similar cases state that determination of the amount of loss necessarily involves the determination of causation. I disagree with this conclusion in two respects. First, this conclusion wrongly conjoins separate legal issues. A "loss" is the "amount of financial detriment caused by . . . an insured property's damage, *for which the insurer becomes liable*." *Loss*, Black's Law Dictionary (10th ed. 2014) (emphasis added). The determination that a loss has occurred is a determination of liability, which necessarily includes questions of causation. *See, e.g., Iowa Elec. Light & Power Co. v. Gen. Elec. Co.*, 352 N.W.2d 231, 234 (Iowa 1984) (stating

causation is a liability concept). The appraisal provision does not give the appraisers the authority to determine whether there is "a loss." Instead, the appraisal provision gives the appraisers the authority to determine "the amount" of "the loss." The determination of "the amount" is a question of damages, which does not include determinations of causation and liability. This understanding is consistent with the general understanding of appraisal. *See* Steven Plitt et. al., *Scope of Appraisal*, 15 COUCH ON INSURANCE § 210:42 (2017) ("As a general rule, the sole purpose of an appraisal is to determine the amount of damage.").

Second, the conclusion that determination of value *necessarily* involves determination of causation is not factually correct. Consider this case. Here, the parties disagreed on whether the storm caused any damage to the roofs and whether any damage was an otherwise excluded loss. There is no reason why the appraisers could not have went to the property, inspected the roofs the insured claimed to be damaged, determined the repair and/or replacement costs of the roofs, and issued an appraisal award without knowing what caused the damage, if any, to the roofs. The parties could then have litigated liability, including questions of causation and coverage, in the district court. If there was a finding the insurer was liable under the terms of the policy, then the appraisal award would be a binding measure of damages.

Not only is the separation of valuation and causation easily accomplished, it seems preferable. For example, in this case, the insurance carrier contended any damage to the roofs was caused by, among other things, prior, uncovered weather events. The appraisers would not necessarily have had any reason to know about the disputed issues. The appraisers also would not have had the

competency or authority to investigate the issue further. The appraisers would not have had, for example, the power to subpoena weather records, the association's records regarding past claims, or the insurance carrier's records regarding the past claims. The appraisers would not have had the competency or authority to interview relevant witnesses, for example, prior homeowners with personal knowledge of the condition of the roofs prior to the most recent storm. The parties, however, could have conducted such discovery separate and apart from the appraisal process.

Separating the valuation and causation determination is also good policy. Empowering an appraisal panel to determine causation raises due process concerns. Take, for example, the appraisal provision at issue in this policy. It does not set forth any process to litigate causation. There is no mechanism for discovery, the taking of testimony, the right of cross-examination, or the making of a record. There is no direction to the appraisers or umpire regarding the standard of proof and the burden of proof. Limiting the scope of appraisal to the valuation of property makes appraisal an efficient and straightforward process. It can be accomplished quickly and without the necessity of a hearing and the creation of a record. In contrast, allowing an appraisal panel to determine issues of causation raises future points of contention and litigation, including the qualification of the appraisers, the competency of the appraisers, the partiality of the appraisers, and whether the burden of proof to establish an event is a covered cause of loss and whether any exclusions are applicable. As this case demonstrates, expanding the scope of appraisal to include causation transforms an efficient dispute-resolution mechanism into an inefficient litigation-creating

mechanism requiring cumbersome rounds of duplicative litigation. Timothy P. Law & Jillian L. Starinovich, *What Is It Worth: A Critical Analysis of Insurance Appraisal*, 13 Conn. Ins. L.J. 291, 296–97 (2007) ("In our view, the scope of appraisable disputes should generally be limited to issues of valuation. Appraisal is designed to provide an inexpensive determination of the amount of loss where coverage is conceded. Allowing, or even requiring, parties to appraise a loss that involves other issues, such as liability or causation, can create multiple proceedings and inefficiencies."). The first round occurring in front of the neutral umpire. The second round occurring in front of the district court. The third round occurring in the appellate courts.

Consider another case to demonstrate both how easily valuation can be separated from causation and the potential mischief created by allowing the appraisal panel to determine both issues. *Salem United Methodist Church v. Church Mutual Insurance Company*, No. 16-0170, 2017 WL 512494, at *1-2 (Iowa Ct. App. Feb. 8, 2017), involved an insurance coverage dispute relating to water damage in a church basement. There was not an appraisal provision in the policy. Assume there was one similar to this case, however. A competent appraisal panel would have consisted of persons experienced in the valuation of property and commercial property repair and replacement. For example, persons familiar with the cost of repairing or replacing office equipment and furniture and persons familiar with the cost of repairing or replacing flooring, drywall, and electrical, plumbing, and mechanical systems, etc. But the primary issue in the case was not valuation. The primary issue was liability, which turned on questions of causation and coverage, specifically what caused the water

damage in the church basement. *See id.* at \*2-3. The witnesses regarding causation were an expert engineer, who testified regarding the operation of sewer systems, and the environmental manager for the City of Cedar Rapids, who testified regarding the backflow in the city's sanitary sewer system caused by flooding. *See id.* at \*3. There is no reason to believe an appraisal panel would have had the competency to determine these complicated issues or would have had access to the resources, e.g., schematics and data regarding the city's sewer system, to determine these issues. Our hypothetical appraisal panel could have determined, however, the cost to repair and/or replace the damaged property, and the appraisal award could have served as a measure of damages after liability had been established in the district court. *Salem United Methodist Church* is but a single example, but one can envision countless scenarios in which the persons conducting an appraisal do not have the competency to determine causation and the persons opining on causation would not have the competency to determine valuation. This is why it is better to keep the issues separate and distinct.

B.

I next address the issue of whether this particular appraisal panel had the authority to determine causation. Because the appraisal provision at issue is contractual, the right of appraisal and the scope of appraisal are governed by the terms of the policy. *See State Room, Inc. v. MA-60 State Assocs., L.L.C.*, 995 N.E.2d 807, 812 (Mass. App. Ct. 2013) ("[S]o too an appraiser can exceed his authority by making an award which is not within the limits of the submission to him. The issue turns on the agreement of the parties."); *Merrimack Mut. Fire Ins.*

*Co. v. Batts*, 59 S.W.3d 142, 152 (Tenn. Ct. App. 2001) ("An appraiser's authority is limited to the authority granted in the insurance policy or granted by some other express agreement of the parties."); *Terra Indus. Inc.*, 981 F. Supp. at 607 (explaining the scope of appraisal can be determined from the language of the policy).

Our rules governing the interpretation and construction of insurance policies are well-settled. The cardinal principle is the parties' intent controls, and we determine intent by examining the text of the policy. *See Amish Connection*, 861 N.W.2d at 236. Here, the policy provides coverage for "direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." (Policy ¶ A.) "Covered Causes of Loss" includes direct physical loss or damage except those causes of loss excluded or limited. (Policy ¶¶ A.3(a), (b), (c).) Either party may make a demand for "an appraisal of the loss." The right to demand "an appraisal of the loss" can be invoked only where there is disagreement regarding "the amount of loss." The policy then sets forth a procedure for selecting appraisers and an umpire. The policy also describes the function of the appraisers, providing the "appraisers will state separately the value of property and the amount of loss."

The language of the policy limits the appraisal's scope to determining the monetary value of a loss and does not extend to questions of coverage and causation. First, the common understanding of "appraisal" is the "determination of what constitutes a fair price for something or how its condition can be fairly stated; the act of assessing the worth, value, or condition of something." *Appraisal*, Black's Law Dictionary (10th ed. 2014). As commonly understood, an

appraisal does not encompass determination of issues other than valuation. *See Jefferson Davis Cty. Sch. Dist. v. RSUI Indem. Co.*, No. 2:08-cv-19-KS-MTP, 2009 WL 367688, at *2 (S.D. Miss. Feb. 11, 2009) (stating "the purpose of an appraisal is not to determine the cause of loss or coverage under an insurance policy; rather, it is 'limited to the function of determining the money value of the property' at issue" (citation omitted)). Second, the policy limits the appraiser's authority to stating the "value of the property and the amount of loss." Nothing in the policy gives the appraisers the authority to opine on liability, coverage, or causation. *See Terra Indus.*, 981 F. Supp. at 607 (construing similar provision to mean "the appraisal process determines the 'amount of actual cash value and loss,' not legal questions of coverage"); *Rogers v. State Farm Fire & Cas. Co.*, 984 So. 2d 382, 392 (Ala. 2007) (finding "no ambiguity in the term 'the amount of loss' as used in the appraisal clause" and "holding that an appraiser's duty is limited to determining the 'amount of loss'—the monetary value of the property damage"); *Batts*, 59 S.W.3d at 152 (holding an appraisal clause regarding the "amount of the loss" limited appraisers to determining "the monetary value of the property damage" and not questions of coverage, liability, or causation). Third, the policy used definite articles to limit the scope of appraisal. Specifically, the policy limits the scope of appraisal to "the loss" and "the amount of loss." Use of the definite article "the" means "the loss" has an antecedent; specifically "the loss" must refer to a specific loss rather than a non-specific loss to be determined by the appraisers. *See Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or

generalizing force of 'a' or 'an.'" (citation omitted)); *State v. Hohenwald*, 815 N.W.2d 823, 830 (Minn. 2012) ("The definite article 'the' is a word of limitation that indicates a reference to a specific object."). "The loss" is to be determined by the finder of fact, while "the amount" of "the loss" is for the appraisal panel. Fourth, as discussed above, there are practical reasons why causation should not be considered within the scope of appraisal.

The district court was thus correct to conclude the appraisal panel award was not binding on causation. "An appraisal is a supplementary arrangement to arrive at a resolution of a dispute without a formal lawsuit." *Cent. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 466 N.W.2d 257, 260 (Iowa 1991). "Appraisal awards do not [constitute] a formal judgment and may be set aside by a court." *Id.* An appraisal award will be set aside where the appraisal provision was improperly invoked, where the appraisers exceeded the scope of work, or where there is fraud, mistake, or misfeasance on the part of an appraiser or umpire. *See id.*; *Taylor*, 2008 WL 4525496, at *5 (holding the appraisal award was confined to its proper scope where the district court specifically discarded "any discussion of facts and/or causation in the report"); Law & Starinovich, supra, at 315 (stating the award may be challenged if "the appraisers go beyond their scope of authority" and citing cases). Here, the appraisal panel made a determination of causation in addition to a determination of value. The determination of causation was outside the scope of the appraisal panel. Causation is a question of liability, which, under the circumstances, was a question reserved for the district court. The district court was well within its authority to disregard the appraisal panel's determination on causation.

C.

Once the district court determined it was not bound by the appraisal panel's determination of causation, the district court was required to consider the issue. The only contested issue with respect to causation was damage to the roofs. The district court found the hail storm at issue caused no damage to the roofs or was not the sole cause of damage to the roofs. The district court found any roof damage was caused in whole or in part by other causes, including manufacturer's defect and "multiple potentially damaging hail storms preceding the storm in question." In reaching this conclusion, the district court relied on the testimony of Marcus Harbert, who was the only person to inspect the roofs before and after the storm. Harbert testified there was damage to the roofs prior to the storm at issue. This fact is essentially conceded by the association, which was seeking to repair the roofs prior to the storm at issue. Harbert's testimony was also supported by the insurance carrier's expert witness.

On this record, the district court's judgment should be affirmed. "This case was tried to the court as a law action and our review is for the correction of errors at law." *Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 490 (Iowa 2000). "The district court's findings of fact have the effect of a jury verdict and are binding on us if supported by substantial evidence." *Id.* "Evidence is substantial when a reasonable mind would accept it as adequate to reach the same findings." *Id.* "We construe the district court's findings broadly and liberally." *Id.* "In case of doubt or ambiguity we construe them to uphold, rather than defeat, the judgment." *Id.* "A corollary rule prohibits us from weighing the evidence or the credibility of the witnesses." *Id.* When the evidence is viewed in

the light most favorable to the district court, the district court's findings are supported by substantial evidence.

## II.

I would affirm the judgment of the district court for an additional, independent reason.  As the majority notes, the policy at issue contained an anticoncurrent clause.  The clause is enforceable.  *See Amish Connection, Inc.*, 861 N.W.2d at 241 (stating anticoncurrent clauses are enforceable); *Salem United Methodist Church v. Church Mut. Ins. Co.*, No. 13-2086, 2015 WL 1546431, at *3 (Iowa Ct. App. Apr. 8, 2015) (enforcing anticoncurrent clause and stating if an excluded cause "is a concurrent cause, there is no coverage").  The district court found and concluded any loss was excluded by the anticoncurrent clause because any damage to the roofs was caused by "one or more things other than or in addition to the August 8, 2012 storm," including "wear and tear, mechanical related to installation, faulty workmanship, [and] manufacturer defect."

The majority contends the district court erred in finding any loss was excluded by the anticoncurrent clause because the appraisal panel's determination of causation was binding on the district court.  I disagree.  First, I disagree with the proposition that the appraisal panel was empowered to determine of causation.  Second, I also disagree with the proposition that the district court would be bound by any such determination.  However, even assuming the district court was bound by the causation determination, the causation determination does not resolve the issue.  The appraisal panel determined the storm at issue was *a cause* of damage to the roofs, but the

appraisal panel did not determine the storm was *the sole and proximate cause* of damage to the roofs. Indeed, the appraisal award explicitly disclaimed making any such determination, providing "The award does not include an evaluation or determination or coverage, policy exclusions or the relative causation of the same." It was thus incumbent upon the district court to resolve any coverage issues, policy exclusions, and issues of concurrent causation. *See North Glenn Homeowners Assn.*, 854 N.W.2d at 71 (stating coverage determination is for the district court).

Here, the district court properly made an independent determination that the loss, if any, caused by the storm was an excluded cause of loss under the terms of the policy. When the evidence is viewed in the light most favorable to the district court's judgment, the district court's findings regarding other causes of loss are supported by substantial evidence.

III.

For the foregoing reasons, I would affirm the judgment of the district court.